DECISION AND JUDGMENT ENTRY
{¶ 1} On October 20, 2004, the Wood County Grand Jury indicted appellant, Ralph Doren, for one count of aggravated murder, a violation of R.C. 2903.01(B) and a felony of the first degree, for the killing of Deana Meeks. The indictment initially included two death penalty specifications, 2929.04(A)(3) and (7), which the state dismissed before trial. After a jury trial, Doren was convicted of aggravated murder. *Page 2 
Pursuant to the version of R.C. 2929.03(A) in effect at the time of the crime, the trial court sentenced Doren to a mandatory term of life imprisonment, with eligibility for parole after 20 years. Because we find an error violated Doren's fundamental right to a fair trial, we vacate Doren's conviction and remand the matter for a new trial.
 {¶ 2} Deana Meeks was killed on June 7, 1991, at 240 Lester Avenue in Northwood Ohio, the home of her mother and stepfather, Boyd "Smitty" Smith. The investigation into her death took over 13 years and was led by four different investigators. In the course of the investigation, three other people were indicted for the murder: Bill Burns and brothers Craig and Todd Magrum. The state dismissed the indictments against the Magrum brothers because, as was revealed at Doren's trial, prosecutors felt that police coerced Craig Magrum's confession. In the other case, the state dismissed the indictment for insufficient evidence.
 {¶ 3} The three previous suspects were part of a group which had been under investigation for illegal activity involving stolen cars. Smith, Meeks' stepfather, was associated with those under investigation, including the three previous suspects. Smith worked at Dave White Chevrolet and also had a "working" garage at 240 Lester Avenue, where he would repair cars for extra income. All three of the previous suspects had "passed through" or "hung out" at 240 Lester Avenue, according to investigators. One investigator, John Helm, described Smith's association with the previous three suspects: "[T]here were a number of people that [Smith] associated with that were involved in criminal activity. And, for instance, they would have him work on cars, paint cars, repair *Page 3 
cars. To say he knew they were stolen or participated in that, I don't think I can say." The scope of the criminal activity was "widespread" and "multi-state." Investigators uncovered no connection between Doren and any of the previous suspects under investigation, aside from their mutual acquaintance with Smith.
 {¶ 4} The evidence adduced at trial against Doren can be separated into two distinct sets. The first set comprises physical evidence, including the coroner's report, DNA evidence, fingerprint evidence, and blood spatter evidence. The second set comprises testimonial evidence.
 Physical Evidence {¶ 5} On Friday, June 7, 1991, Deana Meeks' body was found around 7:15 p.m. by her stepfather, Boyd "Smitty" Smith, in the kitchen of their house at 240 Lester Avenue in Northwood, Ohio. Before Doren's trial, the parties stipulated that Meeks was last seen alive at 1:45 p.m. that day, by a teller at Mid Am Bank, after she had left work. Smith arrived home at approximately 5:30 p.m., and, without entering the house, went straight to a detached garage to work on cars. Two neighbors stopped by to talk and left around 5:50 p.m. Shortly afterward, Smith entered the house through the rear door, which opened into the kitchen. Smith immediately saw Meeks' motionless body lying in a pool of blood underneath the kitchen table, shut the door, and yelled for a neighbor to call the police. He did not re-enter the house until Saturday.
 {¶ 6} Several pictures of Meeks' body, taken by the first officers responding to the scene, were admitted into evidence. The pictures show Meeks lying face-down *Page 4 
underneath a kitchen table in a small kitchen, surrounded by a pool of blood. She was nude except for a T-shirt, and a bath towel lay on the floor beside her legs. Meeks' mother testified that, most likely, Meeks had been waiting for laundry to dry before she went to her second job. Investigators found no evidence that Meeks had taken a shower.
 {¶ 7} Detective Bratton, the first chief investigator assigned to lead the case, did not testify. Testifying officers who responded to the scene — then-Sergeant Douglas Breno, Patrolman Robbie Barrett, and John Helm, an investigator with the Wood County Prosecutor's Office — described the condition of the house when they initially secured the scene. They all portrayed a house that had been thoroughly "ransacked." The front door was locked. The back door showed no signs of attempted forced entry and Meeks' mother and stepfather were unsure whether the back door would have been locked.
 {¶ 8} Dr. Jose Guerra, a radiologist who worked for the Wood County Coroner from 1984 to 2000, responded to the scene at 240 Lester Avenue at 11:30 p.m., and found Meeks' body lying face down. He could see that her throat had been cut, but saw no bruises or other visible injury. By bending one of Meeks' arms and legs, he was able to determine that rigor mortis and livor mortis were present. However, he did not determine the extent of rigor mortis so as not to disturb the scene. He examined a "blood tracing" on her left leg, which suggested that she had been in a seated position at the time her throat was cut, then had slumped to the floor. The blood patterns also suggested to him that in the few minutes before her death, she moved herself several inches to one side. *Page 5 
 {¶ 9} Guerra signed the death certificate and listed the time of death between 2 p.m. and 7 p.m., based on the condition of the body. Since he had never before performed an autopsy and this was his first homicide, he decided to send the body to Lucas County for autopsy.
 {¶ 10} Dr. James Patrick, M.D., the Lucas County Coroner and admitted expert in forensic pathology, performed the autopsy on contract for the Wood County Coroner's Office. He determined that Meeks was killed by a single, incised wound to her throat, which severed the right jugular vein and larynx. The cutting wound had no ragged edges, was slightly higher on the right side than the left, and became deeper as it went along. The only other wound he found was a two inch by three inch "blunt force injury" to the top back of the head, which caused a slight hemorrhage under the scalp. The head injury did not cause any lacerations or fractures. Her face was clear, with no bruising, and no bruises or cuts were found on her legs, arms, or feet. Aside from the injury to the top back of the head, he found no other evidence of blunt force injury and he found no evidence of defensive wounds. He explained that the head injury was most likely caused by the head hitting the table or floor as she fell to the floor after receiving the throat wound. Upon questioning by the defense, he specified that the head injury could not have been caused by her hair being pulled. Patrick found no evidence that Meeks had been sexually assaulted.
 {¶ 11} Upon repeated questioning, he said it was possible, but unlikely, that Meeks had been hit in the face before being killed. He also said it was possible, but unlikely, *Page 6 
that she had struggled or kicked an assailant. The cutting wound to the throat would have caused death quickly, within a matter of minutes. His findings, he asserted, led him to conclude that Meeks was sitting down in a chair when an assailant standing behind her cut across her throat with his right hand from left to right.
 {¶ 12} David Barnes, a special agent with the Bureau of Criminal Investigation and admitted expert in bloodstain pattern evidence, arrived at the scene on June 8, 1991, the day after the killing. At that point, Meeks' body had still not been moved. He testified that the "directionality" of the blood spatters showed that Meeks had been sitting in a chair when her throat was cut from behind. Blood swipes on the floor and on the bottom of her feet indicated that her feet caused the swipes on the floor as her body slumped from the chair. Blood spatters around the perimeter were consistent with blood dropping from a height into already-pooled blood. Blood flow patterns on her legs indicated that blood began flowing down her legs while she was in a seated position before she slumped to the floor in her final position. Barnes concluded, based on the evidence, that Meeks was seated on the kitchen chair with her head reflected backwards, positioning the area of the throat wound over the back of the chair and allowing the blood to flow over her shoulders. The blood on the floor also indicated that after slumping to the floor, Meeks made one final attempt to escape by moving on her elbows several inches underneath the kitchen table. Blood was found only in the kitchen, around the body, and was not found anywhere else in the house. *Page 7 
 {¶ 13} Agent Barnes also attended the autopsy with Dr. Patrick. Barnes collected and submitted the following evidence: the T-shirt, ink prints from both hands, scalp and pubic hair samples, a swab from a stain on the right thigh, and vaginal, rectal, and oral swabs. Upon testing, the evidence showed no sexual assault had been committed or attempted.
 {¶ 14} Agent Barnes also collected fingerprints from the residence at 240 Lester Avenue, and submitted the victim's purse and scattered contents and a magazine from the kitchen table for fingerprint analysis. Fingerprint comparisons yielded matches with the victim, Smith, and another family member. A total of five visible, usable prints remain unidentified. They were compared with Doren's fingerprints and yielded no matches. The unidentified five prints were also compared with prints from the three previously indicted suspects and yielded no matches.
 {¶ 15} With respect to the condition of the house, Barnes reported that the ransacking was more extensive than normally found in burglaries. Contents of every drawer in both of the two bedrooms had been dumped. A coin-operated gambling machine had been opened and the "hopper" containing the coins was removed and was empty. Other valuables were not taken, including a television, a VCR, several guns, and a safe. Barnes asserted that, despite the condition of the house, it did not appear as though a struggle had occurred. No agent had found any evidence that the house had been entered by force. *Page 8 
 {¶ 16} In 2003, Agent Barnes was asked by Detective Trent Schroeder, the fourth and last lead investigator, to review the evidence and re-analyze the case. Barnes again concluded that Meeks was seated in a kitchen chair to one side of the kitchen table with her head reflected backwards when her throat was cut. She was still seated when the blood began to flow, and shortly afterwards slid off the chair and to the floor. He again concluded that nothing in the house indicated that a struggle had occurred.
 {¶ 17} Detective Schroeder, the investigator since 2003, also asked BCI to test a bedspread and the towel Meeks was wearing for traces of urine. None was found.
 {¶ 18} Doren's DNA samples were collected and compared to DNA collected from the following evidence: a cigarette butt from the kitchen table, the towel found on the kitchen floor next to the victim's body, a bedspread, a black nylon bag, the hairs from the victim's body, the swab from the victim's right thigh, and a swab of a stain on the victim's buttocks. The only conclusion drawn in the DNA report is that the profile of the cigarette butt was from an unknown female, not the victim. Two unsuccessful attempts were made to isolate Y chromosomes from the victim's fingernails; the samples did not yield sufficient quantities of Y chromosome DNA for comparison purposes.
 Testimonial Evidence {¶ 19} From 1991 until Doren's indictment in October 2004, four investigators handled the case. Detective Bratton headed the initial investigation from 1991 to 1993. In 1993, the Northwood Chief of Police assigned a task force, including then-Sergeant *Page 9 
Douglas Breno, to continue the investigation. That task force was closed down in 1993, at Northwood Chief Lark's decision.
 {¶ 20} When Breno became Chief of the Northwood Police Department, he assigned Detective William Jackson to the case, who reported to Breno and Sergeant Williams. In June 1995, BCI Agent Darryl Henderson also began working on the case. That investigation resulted in the indictment of Craig and Todd Magrum. According to Wood County Prosecutor John Helm's testimony, the state dismissed the indictments when it learned that Craig Magrum's confession to the murder, which also implicated his brother Todd Magrum, may have been coerced.
 {¶ 21} Boyd Smith, a.k.a. "Smitty," the victim's stepfather, testified that he gave investigators Doren's name as a possible suspect a few weeks after the killing. However, investigators did not consider Doren a suspect or investigate him until April 1997. Doren had been incarcerated since sometime in 1992, on charges unspecified at trial. He contacted Michigan police in April 1997, asserting that he had information about the case which he would reveal in exchange for a modification of his sentence. BCI Agent Henderson and Wood County Investigator Helm went to Cotton Correctional in Jackson, Michigan, to interview Doren.
 {¶ 22} Doren told Henderson and Helm that he knew who had killed Meeks, and that he would only give them information in exchange for a reduced sentence. He explained that he had had at least one heart attack and did not want to die in jail. Without giving Doren any facts about the murder, and viewing Doren with "a good degree of *Page 10 
skepticism," Henderson told Doren that they needed specific information in order to believe his claim.
 {¶ 23} Doren then reported the following: A few days after Meeks was killed, he went to the house of a friend in north Sylvania. The friend came out and met Doren in Doren's van, told Doren to wait a moment, went into his garage, and came back carrying a brown paper sack. The friend got into Doren's van with the sack and placed the sack between the front seats. Doren drove them to a carry out, and the friend went inside to buy beer. While the friend was thus engaged, Doren looked inside the bag, and saw a black canvass-type bag, several pieces of jewelry, some folded pieces of paper, and a blue folder containing a foreign coin collection. He closed the brown sack before the friend returned. He said the friend was also carrying a sock full of quarters.
 {¶ 24} The friend then told Doren to drive to a location north from Sylvania, Ohio, across the Michigan border. They stopped alongside a wooded area, and the friend took the sack, carried it about 30 feet from the road into the woods, and scattered the sack's contents. A few days later, Doren said, he and his friend were at a bar in north Sylvania where a television was broadcasting information about Meeks' murder. The friend told Doren that he was the one who killed Meeks, and Doren then understood the significance of the objects his friend had scattered in the woods.
 {¶ 25} Doren refused to tell Henderson and Helm the name of his friend, other than it was someone with whom he used to smoke crack. Henderson asked Doren to give him the precise location of the items scattered in the woods, and Doren gave them *Page 11 
specific directions to a wooded area. At the spot Doren indicated, investigators found several items which Joyce Baird, Meeks' mother, identified as having been stolen the day Meeks was killed, including the black canvas bag and coin set that Doren mentioned.
 {¶ 26} The weekend after locating the items in the woods, Henderson and Helm returned to Cotton Correctional to re-interview Doren. They told Doren that items from the burglary were found where Doren indicated, but that Michigan authorities were refusing to consider any modifications in his current sentence. Henderson asked Doren again to report the name of the person who committed the homicide; Doren refused, insisting that he wanted a modification of his sentence before he gave the information. Then, Henderson and Helm confronted Doren about being the perpetrator of the burglary and murder if he refused to give the information. Henderson interviewed Doren two more times, the last time in August 1998; each time, Doren refused to cooperate. Once, Henderson and Helm brought Doren's aunt to help them convince Doren to cooperate. Doren told Henderson that his refusal was based on advice from his "legal advisor," Mark Miller, a fellow inmate at Cotton Correctional.
 {¶ 27} Henderson and Helm also contacted Doren's former spouse, Marjorie Dick, who gave them names of Doren's friends with whom he had smoked crack in the years prior to his incarceration. They began to interview everyone with whom Doren had contact around the time of the murder, since Doren had indicated the perpetrator was a friend with whom he smoked crack. *Page 12 
 {¶ 28} Investigators could find no direct links, besides their mutual acquaintance with Smith, between the previous suspects and Doren. They began, however, to focus on the Home Café, a bar in north Sylvania on Alexis Avenue, where Doren and several of his friends gathered to drink almost every day. Smith also went there almost every day on his lunch break from work.
 {¶ 29} It was unclear from the investigator's testimony why the case was closed in 1998, and remained closed until it was re-opened in 2003, when Northwood Detective Trent Schroeder took the case as his first homicide investigation.
 {¶ 30} A. Margaret Robbins
 {¶ 31} Margaret Robbins lived on Lester Avenue in June 1991, across the street and about four houses down from Smith's house. She had only lived there for a couple of months prior to the day Meeks was killed. Patrolman Robbie Barrett, who responded to the scene, spent the evening of June 7, 1991, canvassing the neighborhood and asking neighbors if they had seen anything unusual. He interviewed Robbins around dusk.
 {¶ 32} According to Patrolman Barrett's notes from that day, Robbins told him that between noon and 1 p.m., she was in her front yard doing yard work when she saw a white male, 30 to 35 years old, 5 feet 10 inches tall, about 230 pounds, walking north on Lester Avenue on the opposite side of the street. The man returned 15 to 30 minutes later, walking south down Lester Avenue, on her side of the street. Robbins reported to Barrett that the man was carrying a backpack and wearing cutoff denim jean shorts with *Page 13 
holes in them, brown work boots, a red bandana, a red shirt, and had a ponytail and a mustache. She did not report what color the backpack was. He walked in a "straightforward" fashion, casually, not looking around.
 {¶ 33} Robbins testified at trial. She asserted that police told her that someone would send a sketch artist out the next day to get a more complete description from her, but no one contacted her. She was not contacted until 2003, after Detective Schroeder reopened the case. Detective Schroeder located Robbins, who then lived in Arlington, Texas. Detective Schroeder contacted her by telephone and asked her to look at a photo array. Schroeder sent a photo array to Arlington police, who took it to Robbins while she was at work. Doren's photo was among the six photos in the array; Robbins was not shown pictures of the three previous suspects. Robbins was also given an instruction form. On the form, she checked the box stating, "I cannot positively make an identification at this time." Below, a question asked, "Do any of the persons shown in the photographs resemble the person that you observed?" Robbins checked a box stating, "Yes, the person shown in photo number 4 resembles the person I observed." Photo number four was Doren.
 {¶ 34} At trial, Robbins testified that she saw the man walk by her street between noon and 4 p.m. She asserted repeatedly that she was "99.9 percent" sure that Doren was the man she saw that day. When asked why she did not check the box making a positive identification, she explained that she was not 100 percent sure. At trial, she could not remember what the man was wearing, except that he was wearing brown work boots like *Page 14 
a construction worker. Asked to recall the man's face, she said he had a beard with gray streaks in it, long hair with a little silver in it, was dark, tanned, and had a mustache and heavy eyebrows. Unlike her initial report to Detective Barrett, she did not mention a ponytail. She remembered the incident, she said, because the man "just didn't look like he belonged," and he "looked kinda scary."
 {¶ 35} With respect to the photo array, she testified at trial that her recognition of Doren was "instantaneous," and when she saw his picture, she "kind of fell apart * * * I felt very nervous, and I felt the same chill going through my body that I felt as I saw the man walk past my house." She said she "felt in my gut" that Doren was the person, but not "sure enough to say 100 percent." She did not recall telling Patrolman Barrett that the man walked back down the street 15 to 30 minutes later. Robbins admitted that the photograph of Doren in the photo array does not show a ponytail; in fact, it shows Doren had short hair. A photo of Doren was stipulated to as depicting his appearance in 1991. Doren did not have a ponytail, and the testimony of his acquaintances from 1991 corroborates that fact.
 {¶ 36} Detective Trent Schroeder acknowledged that Robbins was only shown the one photo array, and she was not shown any photo arrays containing pictures of other suspects. *Page 15 
 {¶ 37} B. The Inmates
 {¶ 38} 1. Mark Miller
 {¶ 39} Mark Miller was incarcerated at Cotton Correctional with Doren during the relevant time periods herein, serving a sentence of 25 to 75 years for first degree criminal sexual conduct. In early 1998, Miller contacted unidentified Michigan state authorities seeking relief from his sentence in exchange for information he purported to possess relating to Doren and Meeks' homicide. Miller contacted the authorities by letter; while Henderson testified that he received a copy of that letter, the letter was not introduced at trial. BCI Agent Henderson interviewed Miller at Cotton Correctional in January, 1998, after Doren had ceased speaking to Henderson. Miller testified that he is self-educated in legal matters, and he advises inmates regarding appealing their convictions and other legal issues.
 {¶ 40} Miller explained that he met Doren when another inmate at another jail for whom Miller was doing "legal work" wrote Miller, asking whether Doren was at Cotton and asking Miller to say hello. Doren was impressed that Miller knew his friend, and, therefore, according to Miller, Doren began to trust Miller. Miller testified that sometime during the summer of 1997, Doren approached Miller, told him that he was under investigation for the murder of his friend's daughter and asked whether he had to speak to the police. Miller asked Doren how she was killed, and Doren told him that she was just a teenager who was stabbed with a knife. Miller only knew that the victim's name was *Page 16 
"Deanie" or "Deana." Miller, thinking that any information Doren conveyed may be useful, testified that he secretly began to take notes of what Doren said.
 {¶ 41} After several conversations, Miller suggested to Doren that Miller pretend to interrogate him like a police officer would, "to try to trip you up," "for practice." Doren then told Miller that he went to his friend's house intending to steal money and he thought that no one would be home at the time. Doren said that he did not have to break into the house. Once inside the house, he starting looking for money, but it was not where he thought it would be.
 {¶ 42} Miller then testified that Doren said: "when he [Doren] turned around, the guy's daughter was standing there staring at him and asking him what he was doing. And he says, `What could I say? She knew what I was up to. She was smart enough to figure it out anyway.' He said she yelled at him, `Get out of the house or I'm calling the police.' And then she started to run, but he caught her and grabbed her by the hair. And when he said that, I was walking to his [Doren's] right; and as he said he grabbed her hair, he reached out and kind of quick grabbed me in the back of the shirt collar in the mid-back just real quick and let go; like as he was telling me, it was like he was reliving the moment. * * *
 {¶ 43} "Well, he said he pulled her back into the room. And he said he was trying to calm her down, but she was crying and screaming, wouldn't stop. So he tried to cover her mouth with his hand, but he said it made it worse. He said she started kicking him. And he made a comment like, `The little bitch. If she would have shut up, I would have *Page 17 
left.' And he said he thought — Do you want me to say exactly how he said it? He said he thought she pissed too because he thought his shirt was wet, and he could smell it. He said the next thing he remembers, he hit her, and he thought he made her nose or mouth bleed because she had blood on her face * * *. And he said when he saw blood, he knew he was heading to prison then. He said, `So I killed her,' and shrugged his shoulders as if it was nothing. And I said, `How?' He said, `I stabbed the fucking bitch.' I said, `No shit, Ralph. I meant where?' He didn't tell me where."
 {¶ 44} Soon after, Miller and Doren had another conversation, which Miller related:
 {¶ 45} "* * * And I said, `Well, Ralph, did you wear gloves?' He said, `Of course.' And I said, `Were they rubber like latex?' I was thinking there may have been a breach in the glove, and he said, `No, they're buckskin leather, real high quality.' He looked at me and said, `I know, they don't have prints.' And I said, `What did you do with them?' * * * `Could they have found them?' He said, `No, I burned them.' He said, `I burned my shirt too and threw everything in the Ottegon.' I said, `What's the Ottegon?' He said, `More water than they can search.'"
 {¶ 46} Miller also testified that Doren told him that he had "only been to his [Smith's] house once before that, his new house that is." However, Smith had testified that the house on Lester Avenue, where Meeks was murdered, was not a "new house"; they had been living there for many years prior to the murder. Miller also did not know Smith's name. *Page 18 
 {¶ 47} Miller also said that he asked Doren if he had any "alibi or witnesses that would lie and say you were elsewhere." Doren allegedly told Miller that his ex-wife would provide an alibi, and that Doren said he could trust her "because of the kids." Miller claimed not to know how many children Doren had, because they "never talked about our personal lives, really." However, Doren and his ex-wife did not have any children together.
 {¶ 48} Miller also did not know how many times or where the victim was stabbed. He was adamant that Doren told him that he hit the victim hard enough to make her nose or mouth bleed.
 {¶ 49} When asked on cross-examination if Doren had told Miller whether anyone else was with him, Miller said:
 {¶ 50} "Well, in the beginning of our conversations, again when I'd ask him about if he got rid of the knife, he said, `Yeah, we made sure we got rid of it.' Whether he misspoke at that time or not, I don't know because he never ever referred to anyone else until it seemed like months later. I'd always waited to see if he would mention somebody else again, and he never did. And when he was asking me, you know, or saying he didn't know what evidence the police had against him, I said, you know, I said, `Could they have seen your vehicle?' Anyone — if he had a truck or a car, that's why I said, specifically said vehicle. And he said, no. He said, his partner was with him, and he had to park on a two track hidden from sight. And I said, `A two track? Was this house out in the country?' He said, `No, in town; like a cement two-track.' I don't know what he *Page 19 
meant by that. He said his partner remained in the car, and that's really all he said. I said, `Could this partner be talking to the police?' He said, `No, no, never say anything. Never say anything.' And that was it. Other than those two times, he never referenced anyone else."
 {¶ 51} Miller kept insisting that he kept accurate notes of those conversations, and that he used them to type a statement for Henderson. In his first statement, written for Henderson, Miller made no mention of Doren having a partner or parking on a "two-track."
 {¶ 52} In 2004, at the request of Detective Schroeder, Miller revised his statement. Miller testified the police had typed out his previous statement verbatim, but Miller said that, in 2004, he re-drafted it to fix "punctuation and grammatical errors. I'm kind of meticulous when it comes to things like that, so I redrafted it again. Didn't change the context of it. Just like I said, just mainly punctuation and spelling, check grammatical errors and things."
 {¶ 53} On cross-examination, Miller admitted that two facts to which he testified were not in his initial statement to Henderson, but were in his revised statement written for Schroeder: The fact that Doren was with a partner, and the fact that Doren parked his vehicle on a "two-track" while he was committing the burglary and murder. Miller also admitted that he added information which, he claimed, he learned from Doren later on: That Doren had gone to "the father's" (Smith's) house because he wanted revenge after a business disagreement, not with the intention to steal anything. *Page 20 
 {¶ 54} In exchange for his cooperation and testimony, Miller has received a rescheduled resentencing hearing in order to shorten his prison sentence. In the meantime, Miller requested and received a transfer to another prison. He was also told that $3,000 in reward money was available, which he planned to accept.
 {¶ 55} 2. David Dempsey
 {¶ 56} David Dempsey was an inmate incarcerated with Doren at Cotton Correctional from 1996 to 1998, serving a sentence of 3 to 15 years for home invasion, a felony of the second degree. He was released on parole in October 1999. Although they were not cell-mates, Dempsey knew Doren well enough to have served as a witness to Doren's "do not resuscitate order" power of attorney. He was sitting with Doren during free time when the Michigan state police came to talk with Doren sometime in 1997.
 {¶ 57} According to Dempsey, Doren returned from his meeting with the Michigan police very upset, and started telling Dempsey about the murder investigation, insisting that he had an alibi. According to Dempsey, Doren then proceeded to tell Dempsey about Meeks' murder.
 {¶ 58} Dempsey testified at trial that Doren told him "he had an alibi because he had to cash a check at Food Town at 3:30 was the time. And from there it went on to him and his wife returned to the bar. His wife left with somebody and was suppose to return back, but never did. Ralph was pretty drunk at the time, or had been drinking pretty heavily, and went to Smitty's house. He said — he went on and told me Smitty was like a *Page 21 
father to him; that he used to go fishing and stuff with him, and treated him well, and was just a good guy.
 {¶ 59} "* * * He [Doren] went over to his house, and he said he knocked on the door. There was no answer, so he proceeded to go into the house or get into the house. I don't know whether the door was locked, whether it was not. I don't know that information. Um, and because he knew that Smitty had a large amount of money and/or drugs, I can't remember if he said it was drugs — I don't — for some reason drugs came up.
 {¶ 60} "* * * So he said that he was going — he knew where the money was kept, so he proceeded to make it look like a robbery. And get the money. * * * He said he overturned some things; pulled some sheets or blankets and threw some things on the floor. Just messed up the house a bit. * * * At some point Smitty's daughter came into the house. I don't know if she was there; and I don't know if she came in from the outside or just arrived home, or if she was already home, I don't know. But she came in and startled him, and he stab her [sic].
 {¶ 61} "* * * He said that he took the body, he was down by a lake, was found by the lake. Let me rephrase that. He said the body was down by the lake. He had to wash the blood off. Okay. He had blood on his clothes. * * * Where he went after, I don't know. And he took the clothes off, washed his hands, took his clothes off somewhere, he did not say, and burned the clothes and the knife. The knife didn't burn. * * * He was showing the length. Not just like the length. He said he put it in the ground. And instead of putting it in the ground like this, he put it in the ground like in and stepped on it, went *Page 22 
over with a metal detector. * * * That took several conversations * * *. I didn't put much merit into the victim, as who the victim was, or male or female, okay, because at that point — see, you're jumping a little but on me because I done told you he took her, you know what I mean? She was found down by the lake. * * * He [Doren] told me she was getting ready to go into the Air Force. She was pretty. * * * And it was Smitty's daughter * * * he said 16, 17. * * * He referred to her by a name of Dana or Dino. I can't remember which * * *. Once I found out it was a female and young, I started taking notes."
 {¶ 62} He remembered Doren being very upset when investigators visited Doren to take his fingerprints for comparisons. At trial, Dempsey was questioned about the victim's mother, and he stated, "I believe her name was Jacquelun or Jacquelene. I'm not sure. * * * But he did say she was a very clean lady, good housekeeper, and that there would be no prints." When asked whether Doren told him about anyone else that had been investigated, Dempsey said, "There was several people that came up. There was two brothers indicted, and he was making fun. He was laughing because he was like, "They ain't going to get me because there's two brothers indicted on this case; and another guy, Bill Burns, beat it. And now they're chasing me. They're just coming after me."
 {¶ 63} Because Doren told Dempsey the name of the Michigan state police officer investigating, Mark Seigel, Dempsey contacted Seigel to see if he was "being juked," "because I wanted to know if I was being lied to or this really happened." In exchange *Page 23 
for his cooperation and testimony, Dempsey was given a letter to the parole board, written by Alan R. Mayberry, Wood County Prosecutor's Office. Dempsey was released in October 1999.
 {¶ 64} On cross-examination, he denied his prior statements about Doren taking the victim's body to a lake, saying, "He said he had blood on him, and he went down by the lake to wash the body, to wash his hands off, and the knife. * * * He didn't tell me that he took the body to the lake. I know the body — the body was at the lake, but he didn't tell me that he physically did." He said Doren never mentioned anything about wearing gloves, because he was worried about fingerprints; he did insist, however, that Doren told him that the victim's body was at a lake.
 {¶ 65} 3. Michael Coddington
 {¶ 66} Coddington was an inmate in the same unit with Doren at Cotton Correctional and in Adrian, Michigan; he was incarcerated for first degree criminal sexual conduct with a child under age 13, serving 25 to 30 years. He said that in both places, he and Doren would meet in the yard and Doren would tell him stories about how he was under investigation in the Meeks' murder. Doren told him the victim's name was "Dino," that the murder had occurred in Wood County, Ohio, that the victim was a young girl, and should be going to college and flying planes if she was still alive. Coddington knew that Doren "used to work for her father * * * he had told me two different names. The first name was Dino Burns, and then told me her name was Deana Meeks * * *." *Page 24 
 {¶ 67} Coddington testified that Doren told him that he killed Meeks because she had seen him stealing something from her father, and she said she was going to tell. He repeatedly described the knife as a stainless steel knife, "like a scaling knife for a fish." Doren also told Coddington that he cut her throat. When asked where and when Doren told him that, Coddington said that he was in the yard with Doren and Mark Miller. (Mark Miller, however, testified that he did not know where the victim had been stabbed.)
 {¶ 68} According to Coddington, Doren told him that three other men were with him, but that Doren was going to "take one last person's name to the grave." Coddington said that he gave police this information in 1993, but that police did not contact him again until he was at Cotton Correctional in 1997. He requested, and received, a transfer from Cotton in exchange for his cooperation.
 {¶ 69} On cross-examination, Coddington admitted that Doren had never told him where the murder occurred. After repeated questioning, Coddington said that Doren killed Meeks in "a shower, double shower, walk-in shower, like a big shower. And you can lay down in the shower is what he told me, that's how big a shower it was. * * * He never gave me an address, street, or who owned it or who was renting it or who was buying it or anything of that nature. * * * He said the murder took place in that house. He didn't say what house, what address * * * I don't know whose house it was." Doren also told Coddington that two of the people who were with him when the murder was committed were incarcerated in Alpena, Michigan. *Page 25 
 {¶ 70} C. Doren's Acquaintances
 {¶ 71} 1. Gary Mickens
 {¶ 72} Mickens testified that he knew Doren from their mutual patronage of the Home Café in north Sylvania, and that from 1990 until 1991, he smoked crack with Doren almost every day and "sometimes all night." Mickens admitted to knowing Doren before that, "but he [Doren] came over my house, and said he didn't know how to smoke crack, and I taught him, I guess." Mickens had been using crack every day for several years before he met Doren. Mickens also knew Smith from the Home Café, and knew that Doren had previously worked with Smith. Once, Mickens went to Smith's house with Doren to "paint a Jeep" when Smith was not there. After Meeks was murdered, Mickens testified that Doren was the one who informed him that Meeks had been murdered, telling him that someone had slit her throat.
 {¶ 73} BCI agents interviewed Mickens in 1997, but Mickens couldn't tell them anything and testified that he did not remember anything. Mickens admitted that investigators specifically questioned him about Doren, a black bag, and items taken from Smith's house during the robbery; none of these suggestions, however, aroused any memories. Then, in April, 2003, Northwood police Chief Herman and Northwood Detective Schroeder re-interviewed Mickens. About a week after Schroeder interviewed him, Mickens testified, he remembered the following events:
 {¶ 74} "Ralph [Doren] came over and picked me up. * * * I thought we was going to go get some crack. * * * In early — about `90, `91. * * * It was summer. * * * It was *Page 26 
warm, sunny. * * * Um, we was driving around, and he pulled into this alley and parked the car, and said * * * It was, I don't know, just an alley with — I remember it being up besides a privacy fence. * * * It was just a stone, you know, two-lane thing, like a joggy thing or two-tires. * * * I asked, `What are you doing?' He [Doren] said, "I'm going to go check out a house.' * * * He walked back behind us, behind me. * * * I was mad. * * * `Cause he knows I don't do that. * * * He got in the car, and I noticed blood on him. * * * He hit the trunk or did something, and I turned back, and he was there." He remembered Doren wearing a "long sleeve, like a light-colored shirt." Mickens remembered that blood was on Doren's left sleeve, but he could not say exactly where or how much blood, only that "there was enough I would not go into the bar with him, Tribe's Bar. * * * I noticed the blood, and he looked down and said, "Oh, somebody came home, and I had to hit her."
 {¶ 75} Mickens did not know what day of the week, what month, or what year the incident occurred. He did not know where the alley was; he only remembered that they did not drive on any major highway to get there. He did not see Doren carrying anything in his hands when Doren returned to the car. He never saw Doren with any items from the burglary. After the incident, although he refused to go to Tribe's Bar with Doren, Mickens agreed to go to the Home Café with Doren, because, as he explained, he thought someone he knew would be there and he could get a ride home: "I asked what he [Doren] was going to tell people in there about the blood, and he said, `I don't know. Tell them we was playing with rabbits.'" *Page 27 
 {¶ 76} When Mickens went into the Home Café, he had a short conversation with Jim Botzko, another regular at the Home Café, and then he left. Botzko asked Mickens about the blood on Doren's sleeve, and Mickens told Botzko he did not know anything about it.
 {¶ 77} Mickens acknowledged that BCI investigators had contacted and interviewed him in 1997, and that, at the time, he remembered nothing. BCI investigators specifically questioned Mickens about Doren, Smith, and Meeks' murder, and whether Mickens saw Doren with a black bag or any items which may have been taken from Smith's house.
 {¶ 78} Detective Schroeder testified to his interview with Mickens after reopening the cold case in 2003. Schroeder testified that, while accompanied by Northwood Police Chief Herman, he told Mickens that Doren was talking to investigators, and that Doren knew who committed the murder and was going to name a person who was with him. Schroeder told Mickens that they thought Doren was going to name Mickens as being with Doren when Meeks was murdered. Both Mickens and Schroeder admitted that Mickens did not remember anything about the incident on the two-track alley until after Schroeder told Mickens that they thought Doren would name him. Both Mickens and Schroeder acknowledged that Mickens remembered that Doren was wearing a white T-shirt underneath a long-sleeved light colored shirt and jeans. Mickens repeatedly asserted that all he ever saw Doren wear was jeans, and that Doren never wore shorts. *Page 28 
 {¶ 79} The day after Schroeder and Herman first interviewed Mickens, Mickens contacted Schroeder to tell him what he remembered. That same day, Schroeder and Herman came to Mickens' house, picked him up, and drove him to Lester Avenue. Mickens did not recognize Smith's house, even though he testified that he had been there before. Then, they drove Mickens to an alley one block away from Lester Avenue. The alley was a "two-track" and was bordered by a privacy fence. Pictures of the alley were introduced into evidence, and Mickens testified that he thought it was the same alley where Doren had parked. Details, however, were sketchy, and Mickens remembered seeing a telephone pole in the alley, but in a different location from what he remembered.
 {¶ 80} In exchange for his cooperation, Mickens received immunity from prosecution for the burglary and Meeks' murder; the immunity agreement would be void if prosecutors discovered that Mickens was directly involved in Meeks' murder.
 {¶ 81} 2. James Botzko
 {¶ 82} James Botzko knew Doren mainly from their mutual, daily patronage of the Home Café, but testified that he had known Doren for over 30 years. Botzko related that, a few months before he heard about Meeks' murder, he was at the Home Café when Mickens and Doren arrived. Botzko said that he saw that Doren had blood on his left shirt sleeve and asked Doren and Mickens about it. Botzko described Doren's shirt as white, long-sleeved, with the sleeves rolled up. Doren told Botzko that he had gotten into a fight at the Tribe's Bar; Mickens told Botzko that he would talk to him later. Botzko remembered that Mickens was acting nervously. Botzko thought this happened around *Page 29 
6:00 p.m., but he did not know what day of the week it was. Botzko vaguely remembered that police had interviewed him once a few years after the murder, and once a "couple of years ago."
 {¶ 83} On cross-examination, Botzko said that he heard about the Meeks' murder a few days after seeing Doren and Mickens at the Home Café, contrary to his first statement that he heard about the murder months after seeing Doren with blood on his sleeve. He also admitted that in 1993, he had told investigators that Doren had been wearing a white T-shirt that day, not a long-sleeved white dress shirt. He also admitted that after the incident, he and Mickens worked together at Lighthouse Pools, and that Mickens' family and his family have gone camping together every summer for the past three or four years. He admitted that he and Mickens had several conversations about the investigation after Detective Schroeder began re-interviewing them in 2003.
 {¶ 84} 3. William Eitniear
 {¶ 85} Eitniear also testified that he knew Doren for 30 to 35 years, but mainly from patronizing the Home Café. He also knew Smith from the Home Café. At the end of May 1991, Eitniear was fired from his job, and he began smoking crack nearly every day with Doren. They would smoke crack in Doren's van in the Northtown Mall parking lot.
 {¶ 86} One day, Eitniear was not sure of the exact day, but he thought it was at the end of May or the beginning of June 1991, Eitniear and Doren were smoking crack in Doren's van at Northtown when Doren asked Eitniear if he wanted to break into a house *Page 30 
with him. Doren guaranteed him that there would be at least $20,000 in the house. Eitniear asked whose house it was, and Doren said it was Smith's house. Eitniear told Doren no, and the conversation ended. Despite having been interviewed several times after the murder, and despite his acquaintance with Smith and his knowledge that Smith's daughter had been murdered, Eitniear admitted never having told police about this conversation with Doren. He did admit to telling his uncle, Bill Frankhauser, the owner of the Home Café.
 {¶ 87} 4. Marjorie Dick
 {¶ 88} During June 1991, Marjorie Dick, Doren's ex-wife, lived with Doren in an apartment above the Home Café, along with Doren's mother. She asserted that she had not seen or spoken with Doren since his incarceration in 1992. She also knew Smith and his family and had been to the Lester Avenue house on two prior occasions. Dick testified that, on the Saturday after Meeks' murder, Doren telephoned her at home around 3:00 p.m. and asked her to meet him at Tribe's Bar. She insisted that she had not seen or spoken to him at all on Friday, June 7, the day of Meeks' murder.
 {¶ 89} She met Doren at Tribe's Bar, and described Doren as "quiet." A television started to play coverage of Meeks' murder, and Doren told her that it was Smith's daughter who had been killed before the television reported her name. Dick assumed that Doren knew it was Meeks because he must have seen prior media coverage. She also testified that, although Doren would regularly attend the funerals of friends or relatives, he did not attend Meeks' funeral. *Page 31 
 {¶ 90} With respect to physical evidence, she did not see blood on any of Doren's shirts, but admitted that Doren did own a pair of brown work boots. She repeatedly asserted that Doren had not contacted her and asked her to provide an alibi for him.
 {¶ 91} D. Investigator John Helm
 {¶ 92} John Helm, investigator with the Wood County Prosecutor's Office, began his investigation June 7, 1991, the evening of Meeks' murder, when he was called to the scene around 9:00 pm. He assisted Detective Bratton, who was first in the charge of the investigation. In 1992, Helm participated on the first cold case task force, which investigated William Burns and another suspect. The 1992 investigation was closed at then-Chief Lark's decision. Helm was also aware of Detective Jackson's 1993 investigation, which led to the Magrum brothers' indictments. Helm's office convinced the Northwood Police Department that Detective Jackson should be removed from Meeks' case for a lack of objectivity.
 {¶ 93} When questioned further about Detective Jackson's phase of the investigation, which led to the indictment of the Magrum brothers, Helm explained that the Magrum brothers, along with William Burns and William Jenkins, associated with Smith; Jackson worked undercover, exploring these connections. The suspects were having Smith work on cars, painting and repairing them, as part of a "widespread, multi-state" car theft ring. Helm and other investigators were not able to determine whether Smith knew that the cars were stolen. *Page 32 
 {¶ 94} According to Helm, Craig Magrum had twice confessed to Meeks' murder. Helm's office, however, felt that the confessions were coerced: During Detective Jackson's investigation, Jackson staged a scene for Craig Magrum's benefit where Jackson, while undercover, shot someone else with blank bullets to make it appear as though he had murdered someone. Magrum had then alleged that a confidential informant working with Jackson put a gun to Magrum's head and ordered him to tell Jackson whatever he wanted to know. The confessions were tape-recorded, but Helm still thought they were coerced because Craig Magrum may have felt he needed to confess out of fear that Jackson would kill him.
 {¶ 95} Helm was also involved with BCI Agent Henderson's investigation; Helms reported to then-Wood County Prosecutor Mayberry about his review. Helms focused his investigation on William Burns and the Magrum brothers until April 1997, when Doren contacted them about the property taken from Smith's house. Helm accompanied BCI Agent Henderson to the Jackson, Michigan prison to interview Doren.
 {¶ 96} Helm admitted that Doren insisted he was not giving the name of his friend because he was afraid of being known as a "snitch" in prison, and because Doren wanted to secure a shorter sentence before he took that risk. Doren told Helm and Henderson that on the day Meeks was murdered, he was with a woman friend from 12:15 p.m. until 1:50 p.m., then at 2:40 he got some beer and went home to meet his wife when she had finished working. Doren and his wife then went to a bar, where they stayed until 9:00 or *Page 33 
10:00 p.m. Helm also reported that Doren did not want to provide any more information based on legal advice he was receiving from another inmate.
 {¶ 97} Helm also interviewed inmate Mark Miller. Helm admitted that Miller told neither him nor Henderson any details about Meeks' murder that "only the killer would know."
 {¶ 98} During Helm's testimony, the state played a tape recording of two phone calls which Doren placed from prison during the time Helm and Henderson were investigating him in 1997. Doren placed one call to his mother and another call to his aunt, telling them about the investigation. Later, Doren's aunt visited Doren with Helm and Henderson in order to convince Doren it was in his interest to give the name of his friend who had the stolen property.
 {¶ 99} Before trial, the trial court granted Doren's motion in limine to bar any mention of a polygraph test in relation to Doren. The state, before trial, had purportedly given Doren's trial counsel a transcript of the telephone recordings to be played at trial. Appellate transcripts show that after the tape was played to the jury, Doren's counsel objected that the tapes were not redacted as the state provided; apparently, mention of polygraph tests remained on the tape and were played to the jury in violation of the motion in limine.
 {¶ 100} The trial court immediately instructed the jury to disregard any mention of a polygraph test. A recess was called for the state to repair and redact the tape *Page 34 
recorded telephone conversations to conform to the transcript given to and approved by the defense. After the recess, the newly redacted tape was played for the jury.
 {¶ 101} Throughout trial, the trial court allowed jurors to submit written questions, which both parties approved before they were read to the testifying witness. At the conclusion of Helm's testimony, and despite the first curative instruction, the jury submitted seven written questions asking whether Doren had, in fact, submitted to a polygraph test. The trial court did not read Helm those jury questions, and gave another curative instruction for the jury to disregard the prior tape and to disregard the sound gaps in the second tape. The trial court denied Doren's trial counsel's motions for a mistrial.
 {¶ 102} The record on appeal does not contain the original tape which was mistakenly played and the transcript does not report what the jury heard. Only the redacted version of the tape was made part of the record on appeal. Several long sound gaps can be heard; presumably, these gaps represent spaces where mentions of a polygraph were erased.
 {¶ 103} E. Detective Trent Schroeder
 {¶ 104} Detective Schroeder, a sergeant with the City of Northwood Police Department, was the last investigator to open the Meeks' cold case. The Meeks' homicide was his first assignment as a detective, and his first homicide investigation. When he opened the case in 2003, he found the evidence and documents from the prior investigations "in disarray, quite disheveled." He was directed by the Northwood Chief to analyze the investigation only as it pertained to Doren. *Page 35 
 {¶ 105} He began by re-interviewing people who had been interviewed last in 1997, including Mickens, Botzko, and Eitnear. When he contacted Mickens, he informed Mickens that a witness had seen Mickens and Doren enter the Home Café on the day of Meeks' murder and that Doren had blood on his sleeve. Schroeder also told Mickens that he may be named as being involved in the homicide, stating: "It was my belief that [Doren] may very well name Mr. Mickens." Schroeder acknowledged that Mickens told him several times that he could not remember anything about that day. He also acknowledged asking Mickens, "Would there be any reason for you to be worried it's your name [that Doren would give]?" Schroeder explained: "My whole purpose of this is to see if I could assist Mr. Mickens in recollecting that time frame since it was 12 years ago." According to Schroeder, Mickens was not surprised that the investigators thought Doren would name Mickens, having gotten that information from "another source."
 {¶ 106} Mickens called Schroeder the day after Schroeder interviewed him. Schroeder told him that he wanted Mickens to remember something about the blood on Doren's sleeve the day of Meeks' murder. Most interestingly, on a jury question, Schroeder asserted that he had not talked to Botzko before he talked to Mickens, although only Botzko testified to having seen blood on Doren at the Home Café, while Mickens testified that he had already heard that Schroeder suspected Mickens' involvement. Mickens then told Schroeder the sequence of events described in his testimony, supra. After receiving the call, Schroeder and the Northwood Police Chief drove to Mickens' house, picked him up, and took him to Lester Avenue. Schroeder admitted that Mickens *Page 36 
did not recognize Smitty's house, although Mickens had testified he had been there once before with Doren. He drove Mickens to a two-track alley one block from Smitty's house, because the alley was consistent with Mickens' description.
 {¶ 107} Schroeder said Mickens was "visibly shaken," when he saw the alley, although Mickens was "having difficulty remembering" and could only say that the alley "resembles the area that he was familiar with." Mickens did not instantly recognize the alley as the same alley where Doren had parked the day of Meeks' murder. Schroeder also drove Mickens around the neighborhood, to refresh his memory, and also showed Mickens another two-track alley across Woodville Road from Lester Avenue, but there, Mickens did not recognize anything.
 {¶ 108} Schroeder acknowledged that Mickens' memory of the alley did not have "great detail." However, he explained that as their discussions progressed and after Mickens saw the alley, "there was more detail — more additions to what he had originally told me." He admitted that Mickens did not know that the alley was located in Northwood. On a question from the jury, Schroeder admitted that Mickens gave no detailed description of the alley, apart from the existence of a privacy fence on a two-track lane, before Schroeder took Mickens to see the alley by Lester Avenue.
 {¶ 109} Schroeder also talked to Mickens on July 8, 2003, to inform him that Margaret Robbins had identified Doren from a photo array. He did not specify that Robbins had not positively identified Doren. Schroeder also admitted that Robbins was not given a photo lineup which included any of the other previous suspects in the case. *Page 37 
 {¶ 110} Schroeder testified at first that he only contacted Doren in prison after two years, near the end of his investigation. On cross-examination, he admitted that he talked to Doren in October 2003, near the beginning of his investigation. Doren consistently denied any involvement in Meeks' death, and still refused to give any information about another person.
 {¶ 111} Schroeder admitted that he did not interview any new persons since opening the investigation, had not opened any new leads, and uncovered no new physical evidence. He admitted speaking to inmate Mark Miller three times, and based on Miller's story that Doren said Meeks had urinated during the struggle, had the towel Meeks was wearing at the time of her death tested for urine. No urine was found. He also admitted that Mark Miller gave him no information corroborating the physical evidence of Meeks' murder, including where she had been stabbed, what she was wearing, or that she was killed in a kitchen.
 {¶ 112} Schroeder was the first investigator to find Margaret Robbins. He sent her the photo array from which she identified Doren as resembling the person she saw walking down Lester Avenue the day of Meeks' murder. Schroeder acknowledged that, on the day of Meeks' murder, Robbins had described a man with a pony tail and wearing a red tank top, a red bandana, and cutoff blue jean shorts. He also acknowledged that Eitniear originally told Schroeder that he did not hang around Doren until late 1991 or 1992, after Meeks' murder, contrary to Eitniear's testimony at trial. Schroeder also *Page 38 
acknowledged that Botzko originally told him that he saw Doren wearing a white T-shirt, not a long-sleeved dress shirt, with blood on it at the Home Café.
 {¶ 113} Doren was not indicted until October 2004. After the trial court entered the conviction for aggravated murder, it sentenced Doren to life in prison with eligibility for parole after 20 years. This timely appeal as of right followed.
 {¶ 114} Doren raises the following errors for review:
 {¶ 115} "I. The verdict was against the manifest weight of the evidence.
 {¶ 116} "II. The trial court erred by not granting Doren's request for a mistrial when the prosecution played an unredacted tape of a telephone conversation discussing a polygraph contrary to the trial court's order.
 {¶ 117} "III. The state engaged in a pattern and practice of asking clearly inappropriate questions, tried to elicit information contrary to a court order and otherwise engaged in misconduct.
 {¶ 118} "IV. The trial court erred by not dismissing two jurors; one for cause during voir dire and one during the trial for repeatedly sleeping.
 {¶ 119} "V. The trial court erred by not granting Doren's Rule 29 motion for judgment of acquittal because there was insufficient evidence to prove that he was criminally liable.
 {¶ 120} "VI. Doren received ineffective assistance of counsel. *Page 39 
 {¶ 121} "VII. The trial court erred when it did not require law enforcement to turn over all information acquired since the investigation began in 1991 to the prosecutor."
 {¶ 122} Upon a thorough review of the record, we find Doren's second assignment of error well-taken. This error deprived Doren of a fair trial in violation of his right to due process of law. Because the error entitles Doren to a new trial, his other assignments of error are moot.
 Analysis {¶ 123} In his second assignment of error, Doren argues that because the mention of a polygraph test remained in the jurors' minds despite curative instructions, only a mistrial could have cured the prejudice. In response, the state argues that merely mentioning a polygraph test in connection with Doren does not warrant a mistrial, because it did not adversely affect Doren's substantial right to a fair trial.
 {¶ 124} A jury is presumed to follow instructions, State v.Henderson (1988), 39 Ohio St.3d 24, 33, citing Parker v. Randolph
(1979), 442 U.S. 62. Here, despite the curative instruction, seven jurors still asked questions regarding a polygraph test.
 {¶ 125} Doren's counsel moved for a mistrial immediately after the flawed tape was played in violation of the order in limine. After denying Doren's motion for a mistrial, the trial court stated:
 {¶ 126} "Ladies and gentlemen, the playing of the tape recording is going to be stricken in its entirety, and you are to disregard everything that you heard on that tape this *Page 40 
afternoon. With that said, let's take our mid-afternoon break. Remember your admonitions."
 {¶ 127} During the break, the prosecution redacted the tape to eliminate the references to a polygraph test. After the break, the defense waived the state re-laying the foundation for the tape's admissibility, having reviewed the redacted version. The court continued: "Disregard completely what you heard on 122 before the break, and this is the 122 that you are to consider." The redacted tape was then played; this tape, included in the record on appeal, contains several lengthy sound gaps, which presumably represent the redacted portions.
 {¶ 128} At the end of Helm's testimony, the jury submitted seven written questions about a polygraph test. The court gave another curative instruction to disregard the previous tape, stating:
 {¶ 129} "And I'll answer the last question. The last question is, what are the sound break or gaps in the first tape? And just let me give the following instruction. Statements that are stricken by the Court or which you are instructed to disregard are not evidence and must be treated as though you never heard them. You must not speculate as to why the Court sustained the objection to any question, or what the answer to such question might have been. You must not draw any inference or speculate on the truth of any suggestion included in the question that was not answered.
 {¶ 130} "And with respect to the gaps in the first tape, again, all that is submitted to you must comply with the Rules of Evidence. You won't speculate why those gaps are *Page 41 
there. Both counsel have concurred those gaps dealt with evidence that did not comply with the Rules of Evidence, and, therefore, they were not included."
 {¶ 131} When the state violates an order in limine, the violation may be "harmless and completely innocuous" — only if, however, the violation did not publish new information to the jury and the remaining evidence strongly counterbalances or compensates for the error. State v.Jenkins (1984), 15 Ohio St.3d 164, 217. Prejudicial error exists, however, if the weight of the remaining evidence cannot overcome the damage done.
 {¶ 132} Polygraph tests are "complex, confusing to the jury, and not relevant to issues at trial." State v. Jackson (1991), 57 Ohio St.3d 29,37. A defendant's professed willingness to submit to a polygraph test is inadmissible and sometimes constitutes prejudicial error. See State v.Hegel (1964), 9 Ohio App.2d 12, 13 (admission of testimony of defendant's refusal to submit to a lie detector test constitutes prejudicial error); State v. Smith (1960), 113 Ohio App. 461 (admission of testimony relating to submission of accused to a lie detector test, even though results thereof are not disclosed, constitutes prejudicial error where no curative instructions were given); State v. Miller (Apr. 20, 1987), 5th Dist. No. 86AP060038.
 {¶ 133} In several cases, curative instructions to disregard testimony regarding polygraph tests could not undo the damage inflicted by the mention of the test. State v. Miller, supra; State v. Bates (Apr. 1, 1982), 8th Dist. No. 43904 ("[T]he mere offer or refusal to undergo such test should also be excluded because unwarranted inferences are *Page 42 
likely to be drawn as to defendant's guilt or innocence." The "damage had been done," even though the state withdrew the questions and the court gave curative instructions); State v. Harris (Oct. 3, 1984), 1st Dist. No. C-830927 (finding trial court erred in not granting mistrial because the case "turned upon the credibility of the witnesses. * * * the introduction of the evidence concerning the victim's polygraph test was highly prejudicial * * * and no curative instruction could remove the harm that may have been done.")
 {¶ 134} In this case, the prosecution entered reference — whether mistakenly or not — to a polygraph test in violation of the order in limine. As Doren did not testify, the tape recording is the only chance the jury had to hear Doren's voice and his version of what he did the day of Meeks' murder. While a jury is presumed to follow instructions,State v. Henderson (1988), 39 Ohio St.3d 24, 33, citing Parker v.Randolph (1979), 442 U.S. 62, this jury demonstrated sustained curiosity about a polygraph test by submitting seven written questions despite the first curative instructions. It is unlikely that the second curative instruction removed the error's taint from the jurors' minds.Bates, supra; Harris, supra.
 {¶ 135} The state cites several cases where the mention of a polygraph, alone, did not cause prejudice. However, prejudice was found where the prosecution either violated an order in limine or the remaining evidence against the defendant was thin. See, e.g., State v.Smith, 2d Dist. No. 2003-CA-23, 2004-Ohio-665, ¶ 46-47. Where no prejudice was found, the reference to a polygraph was fleeting or adequate curative instructions were given. See, e.g., State v.Greer (July 27, 1988), 1st Dist. No. C-870333 (specifically *Page 43 
noting that it did not hold "that admitting evidence that a defendant has taken a polygraph examination will never be prejudicial.");State v. Williams (Mar. 26, 1997), 1st Dist. No. C-960296 (noting that a curative instruction is "often sufficient" to remove any prejudice that might affect the trial's outcome, citing State v. Loza (1994),71 Ohio St.3d 61, 75.)
 {¶ 136} The remaining evidence against Doren is thin and rife with inconsistencies. As such, the evidence cannot counterbalance the damage which the violation of the order in limine inflicted. Dempsey's and Coddington's stories were both completely at odds with the physical evidence. Mickens', Botzko's and Miller's stories were only slightly more substantial.
 {¶ 137} Miller wrote two statements for investigators; those statements were not made part of the record on appeal. In his first statement, written in 1998, Miller conveyed what Doren told him during their incarceration in 1997. Much of what Miller wrote was at odds with the physical evidence. Most inconsistent was Miller's story that Meeks surprised Doren and Meeks was screaming, had tried to run, that Doren hit her in the face hard enough to cause bleeding, that Doren had grabbed Meeks by the hair, and that Meeks had urinated during the fight. The coroner established that the injury to Meeks' head was not caused by pulling her hair, and it was not a hard hit but was most likely caused by a bump when she slid to the floor after her throat was cut. The coroner and the blood spatter expert testified that Meeks was in a seated position at the kitchen table when her throat was slit. No evidence of urine was found on or around Meeks or at the scene. Meeks had no defensive wounds, scratches, or bruises, her fingernails yielded *Page 44 
no DNA, and her face showed no signs of trauma or blunt force. Instead, the evidence showed that she was killed by a single, deep cut to her throat, while she was in a sitting position at the kitchen table, wearing a towel that had not fallen off until after she was killed and slumped to the floor. Agent Barnes testified that the scene did not appear as though any struggle with the victim had occurred.
 {¶ 138} Miller wrote his second, revised statement in 2003, two weeks after Schroeder first heard Mickens' story, at Schroeder's request. Then, Miller added the information that Doren was with a partner and parked his vehicle in a two-track alley. This is the only information Miller gave which Mickens corroborated. Miller's explanation for the discrepancy was that some of his original notes of conversations-written on tiny pieces of paper and hidden from discovery by guards and other inmates-were lost and later found, despite Miller's having moved to another institution in the interim. Also, while Miller originally wrote that Doren admitted robbery as a motive for the killing, in his revised statement, Miller wrote that Doren had told him that he killed Meeks in revenge against Smith for business dealings. Miller did not know what items were taken during the robbery.
 {¶ 139} Schroeder first talked to Mickens on April 30, 2003, and Mickens told him his story about the alley the next day. Schroeder first talked to Miller on May 15, 2003, with a copy of his first statement, and subsequently asked Miller to revise his first statement into the second statement. *Page 45 
 {¶ 140} Mickens — despite being interviewed in 1997 about Doren, Smith's robbery, Meeks' murder, and a black bag — did not remember anything until confronted by Schroeder in 2003. Then, his story was vague — Mickens could not remember what day, month, or year the incident on the two-track occurred, he could not recall where the two-track alley was, and he never saw Doren with any items from the robbery.
 {¶ 141} Mickens' description of Doren the day they were in the two-track alley also conflicts with the description given by Margaret Robbins, Smith's neighbor. Mickens told investigators that Doren was wearing a long sleeve white shirt and jeans and did not have a ponytail. Robbins reported seeing a man wearing a red shirt, cut-off jean shorts, a red bandana, and a ponytail.
 {¶ 142} While Mickens' story of the blood on Doren's sleeve was corroborated by Jim Botzko, both Mickens and Botzko admitted to being close enough for their families to go camping together every year, and they both admitted discussing Schroeder's investigation with each other. Schroeder acknowledged asking Mickens to recall an incident with blood on Doren's shirt, yet Schroeder also asserted that he did not speak with Botzko before talking to Mickens. When Schroeder told Mickens that he thought Doren would name Mickens as having participated in the robbery and homicide, Mickens said he had already heard that information from another source.
 {¶ 143} Likewise, William Eitniear, Doren's acquaintance with whom he smoked crack, was questioned by investigators several times after the murder. He acknowledged never having reported that Doren propositioned him to rob Smith's house before the *Page 46 
murder. While Eitniear testified at trial that Doren propositioned him in late May or early June 1991, he admitted on cross-examination that he had originally told investigators in 2003 that he did not even start "hanging out" with Doren until "the end" of 1991.
 {¶ 144} The remaining evidence does not constitute overwhelming proof of guilt. Nor does the remaining evidence counterbalance the damage done by the state's violation of the order limine. This matter differs from cases where a court must presume the jury followed its curative instructions. Prejudice was demonstrated by the seven written jury questions submitted after the curative instructions. It should have been evident to the trial court that the jury was irreparably tainted such that a fair trial was no longer possible. State v. Franklin (1991),62 Ohio St.3d 118, 127. Therefore, we must find that the trial court abused its discretion by refusing to declare a mistrial. State v. Ahmed,103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 92-93, citing State v. Glover (1988),35 Ohio St.3d 18, 19. Doren's second assignment of error is well-taken. As this assignment of error is dispositive of the appeal, the remaining assignments of error are moot.
 Conclusion {¶ 145} We find that the trial court wrongly failed to declare a mistrial after the prosecution violated an order in limine by publishing Doren's statements regarding a polygraph test. The gravity of the error, considered in light of the paucity of evidence remaining against Doren, violated his fundamental right to a fair trial. Doren's judgment of conviction must be reversed, and a new trial is warranted. *Page 47 
 {¶ 146} On consideration whereof, the judgment of the Wood County Court of Common Pleas is reversed. This matter is remanded to that court for further proceedings consistent with this decision and judgment and the applicable law. Appellee is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Thomas J. Osowik, J., and William J. Skow, P.J., CONCURS AND WRITES SEPARATELY.
 Mark L. Pietrykowski, J., DISSENTS AND WRITES SEPARATELY. *Page 48