[Cite as *State v. Zimmerman*, 2011-Ohio-6156.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 96210**

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## AMANDA ZIMMERMAN

DEFENDANT-APPELLANT

---

**JUDGMENT:**
**AFFIRMED**

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-538900

**BEFORE:**   Jones, J., Kilbane, A.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**   December 1, 2011

**ATTORNEY FOR APPELLANT**

Kelly A. Gallagher
P.O. Box 306
Avon Lake, Ohio 44012


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Scott Zarzycki
Carl Sullivan
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, ohio 44113


LARRY A. JONES, J.:

{¶ 1} Defendant-appellant, Amanda Zimmerman, appeals her convictions for negligent homicide, negligent assault, assault, and failure to stop after an accident. Finding no merit to the appeal, we affirm.

### Procedural History and Pertinent Facts

{¶ 2} In 2010, Zimmerman was charged with two counts each of murder and

felonious assault and one count each of aggravated vehicular homicide, theft, and failure to stop after accident. The matter proceeded to a jury trial. During voir dire, Zimmerman, who was pregnant, claimed she was experiencing pain and bleeding. She told the court that she could wait to the end of the day to seek medical attention, but the court decided to revoke her bond, set bond at $100,000, and remanded Zimmerman for evaluation by the county's medical staff. She was then transported to the hospital for further evaluation.

{¶ 3} After Zimmerman left the courtroom, defense counsel informed the court that he had concerns about Zimmerman's competency and claimed she was not assisting him in her defense. Counsel asked to withdraw from the case. The court denied the request. Later that afternoon, the trial court called the jury back into the court room and dismissed them for the day, telling the jury that there were "medical issues that needed attending to." Defense counsel objected, asking the trial court to not address the jury outside the presence of his client.

{¶ 4} Counsel made another motion to have his client evaluated for competency and sanity, which the trial court denied.

{¶ 5} The hospital cleared Zimmerman and she returned for trial the next day; the trial court reinstated her original bond. Trial commenced and the following pertinent information was presented.

{¶ 6} On December 16, 2009, Zimmerman and her boyfriend, Ciro Marzano, went to Gino's Bar and Grille in Cleveland. Maria Puente, the bartender, testified that

the couple were drinking and Zimmerman was acting intoxicated and "hyper." Zimmerman began to argue with Marzano about her purse and Marzano decided to take her home. Puente, who went outside to smoke a cigarette, saw the couple drive away in a pick-up truck. Puente saw the truck stop suddenly in the street; Zimmerman got out of the truck and picked "something up."

{¶ 7} William Angel, a friend of Zimmerman, testified that he was at a convenience store when he received a call from Zimmerman's father, asking him to pick Zimmerman up at the bar because she had just been "jumped." He testified that while he was in the parking lot of the convenience store, he saw a pick-up truck "flying up the street" with a body hanging from the passenger door. He described the driver as a woman with blond hair. Angel testified that shortly thereafter he saw Zimmerman in the driver's side seat of the same pick-up truck talking to someone who was cleaning the side of the truck with a rag. Angel testified that Zimmerman offered him $10,000 to not testify against her.

{¶ 8} Jerry Key testified that Zimmerman called him the night of the incident and asked him to come to her house. Zimmerman told Key that she got "into it with her new sugar daddy and he fell off the truck * * * and he was in the hospital." Key thought Zimmerman was "on drugs." Zimmerman called Key the next day and asked him to pick her up because Marzano was dead and "her people were going to turn her over to the police." After he picked her up, Zimmerman told him that she and Marzano went to a bar and she wanted to "get high." The couple got into an argument and left the bar.

According to Key, Zimmerman admitted she drove Marzano's truck "about two blocks" with Marzano hanging onto the passenger side window of the truck. Marzano fell off the truck, but, according to Zimmerman, "he had no business hanging on." She further told Key that "if the son-of-a-bitch wouldn't have fallen off, I would have smacked him against a pole * * * ."

{¶ 9} Key testified that Zimmerman told him she took the truck to a "chop-shop" but the shop would not buy the truck, so she brought the truck back to the area and parked it on the street. Finally, according to Key, Zimmerman told him Marzano would still be alive if he had not grabbed onto the truck.

{¶ 10} Cleveland Police officer Brian Pfeiffer responded to the area of West 53rd Street and Denison Avenue in Cleveland for reports of a man in the street. When the officer arrived, an ambulance had already taken Marzano to the hospital, where he died after unsuccessful attempts to save him.

{¶ 11} The coroner, Dr. Frank Miller, testified that Marzano suffered many internal injuries, including bleeding between the skull and scalp, bleeding between the brain and skull, multiple contusions on the brain, a broken neck, and other internal hemorrhaging. He opined that Marzano had bleeding in the brain caused by blunt impacts and the bruises on the different areas of the brain came from a "head that was moving during impact," supporting the state's theory that Marzano was dragged to his death. The coroner further testified that the cause of death was a combination of Marzano's injuries, mainly his head injuries. He also indicated that Marzano's injuries

could have been caused by just one fall, so as long as Marzano was in motion at the time of the fall. But, the coroner opined, because of the extent of his injuries, it was evident that Marzano had been "sliding down the roadway" and the injuries could not have been caused solely by his running next to the vehicle.

{¶ 12} Patrolman Dwayne Corbin of the Cleveland Police Department, testified that on the evening of December 16, 2009, around 11:30 p.m., he received a report that Zimmerman was trying to commit suicide. He went to her house and found her in the backyard, where she was being held down by family members. The officer noted only a small bump on her forehead and cuts on her arm. He took Zimmerman to the hospital. At this time, the police did not know about Zimmerman's involvement in Marzano's death.

{¶ 13} On December 22, the police went to Zimmerman's house. She initially denied who she was. After confessing her true identity, the police arrested Zimmerman and she agreed to make a written statement.

{¶ 14} During trial, the testifying detective read Zimmerman's written statement into the record. According to the statement, on the night of Marzano's death Zimmerman was drinking, smoking "weed," and "doing Valiums." She and Marzano went to the bar and Marzano got mad because Zimmerman's phone kept ringing; Marzano took the phone and threw it in the street. When they left the bar and got into the pick-up truck, Marzano banged her head into the truck's "four-wheel drive knob thing." He then got out of the truck and walked around the front of the truck towards

her.  She reached over, grabbed the gear shift, and drove away.  According to Zimmerman's statement, she "kept driving * * * and when I got to the corner I stopped. He [Marzano] is still pounding on the window yelling * * * I didn't know he was hurt." She further averred in her statement:  "I heard what happened, that [Marzano] was in an ambulance and everything, I thought it was his arm or something.  I called the hospital and they told me that he passed away."

{¶ 15} After the detective's testimony, the state rested its case.  Zimmerman took the stand in her own defense and testified that she had dated Marzano for a few months. She testified that she would go to the bar every day with Marzano and admitted she regularly smoked marijuana and took Valium that she got from her aunt.

{¶ 16} On December 16, she and Marzano went to the bar and they got into a fight over her cell phone.  Marzano took her cell phone and threw it into the street.  The couple left the bar and Marzano stopped the truck for Zimmerman to get her cell phone. When she got back in, he locked her door, grabbed her hair, and began slamming her head into the floor of the truck before getting out of the truck and walking around to the passenger side.  Zimmerman testified she was scared of Marzano because he was beating her, so she got into the driver's seat, threw the gear shift into drive, and drove off to get away from him. She acknowledged that she saw Marzano run alongside the truck, banging on the passenger-side window as she drove off.

{¶ 17} She testified that Marzano had banged her head into the gear shift 15 times and she ended up with a knot on her forehead and cheek and three broken teeth.  She

claimed she never meant to hurt Marzano and was driving away from him because he was beating her. After she learned her boyfriend had died, Zimmerman testified she cut herself on the arm with a screwdriver "48 times." Zimmerman claimed she never lied to police about her identity.

{¶ 18} The jury convicted Zimmerman of misdemeanor negligent homicide, negligent assault, assault, and failure to stop after an accident. The jury acquitted her of the rest of the charges. The trial court sentenced her to house arrest and six months in jail.

{¶ 19} Zimmerman appealed her convictions, raising the following assignments of error for our review:

> "I. The trial court erred in denying the defendant's motion for referral to the psychiatric clinic for evaluation of competency to stand trial.
>
> "II. The trial court violated the defendant's constitutional right to be present at every stage of her trial.
>
> "III. The indictment for failure to stop after accident was invalid on its face and should have been dismissed.
>
> "IV. The defendant's convictions were against the manifest weight of the evidence.
>
> "V. The trial court violated the defendant's right to confrontation when it allowed a medical examiner to testify who did not conduct the autopsy and allowed the introduction of the autopsy report."

## Competency and Presence of Defendant

{¶ 20} In the first assignment of error, Zimmerman argues that the trial court erred in denying defense counsel's request for a referral for a competency exam. In the

second assignment of error, Zimmerman claims that the trial court violated her right to be present at every stage of her trial.

{¶ 21} We begin with the premise that a defendant is presumed to be competent. R.C. 2945.37(G). "If, after a hearing, the court finds by a preponderance of the evidence that, because of the defendant's present mental condition, the defendant is incapable of understanding the nature and objective of the proceedings against the defendant or of assisting in the defendant's defense, the court shall find the defendant incompetent to stand trial." Id.

{¶ 22} The decision whether to hold a competency hearing once trial has begun is in the court's discretion. *State v. Thomas*, 97 Ohio St.3d 309, 315, 2002-Ohio-6624, 779 N.E.2d 1017, citing *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 492 N.E.2d 401. "The right to a hearing rises to the level of a constitutional guarantee when the record contains sufficient 'indicia of incompetency' to necessitate inquiry to ensure the defendant's right to a fair trial. Objective indications such as medical reports, specific references by defense counsel to irrational behavior, or the defendant's demeanor during trial are all relevant in determining whether good cause was shown after the trial had begun." *Thomas* at id. (internal citation omitted).

{¶ 23} Here, Zimmerman argues that the trial court abused its discretion in refusing to continue trial so that her competency could be assessed. We do not find, however, that the record shows sufficient "indicia of incompetency" to have necessitated inquiry.

{¶ 24} Shortly after Zimmerman was remanded into custody for a medical evaluation, defense counsel indicated to the court that he had concerns that Zimmerman was not competent because she was not returning his calls. He stated he was making his request based "upon my attorney-client privileged discussions [with Zimmerman] back in the holding cell." Counsel indicated he had concerns that Zimmerman was unable to assist him in preparing her defense and had previously shared those concerns with the prosecutor. Counsel further stated that Zimmerman had just told him that day that she was hearing voices and "things along those lines."

{¶ 25} The trial court noted that Zimmerman was depressed over the death of her boyfriend and was receiving mental health counseling, but there was no indication she was incompetent. The trial court further noted that counsel had been working with Zimmerman for a long time and was not able to give any basis to suggest that Zimmerman was unable to assist in her defense. After a thorough review of the record, we agree with the trial court's assessment and find no abuse of discretion.

{¶ 26} Next, Zimmerman claims that the trial court erred when it addressed the jury after she had been remanded due to her medical condition.

{¶ 27} A criminal defendant has a right to be present during every critical stage of the trial proceedings. Crim.R. 43(A); *Illinois v. Arlen* (1970), 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353. Here, after Zimmerman was remanded, the trial court addressed the jury to let them know that they were free to go home until the next day, that there were "medical issues that needed to be attended to," and to give them the standard

admonishment not to discuss the case. The trial court did not indicate that it was the defendant who had the medical issues, nor did it discuss anything substantive with the jury during this time; the jury received neither testimony nor evidence, and no critical stage of the trial was involved. See *State v. Frazier*, 115 Ohio St.3d 139, 160, 2007-Ohio-5048, 873 N.E.2d 1263, certiorari denied 128 S.Ct. 2077, 553 U.S. 1015, 170 L.Ed.2d 811. It is the defendant that must show she was prejudiced by her absence from the court proceedings and Zimmerman has not done so in this case. See, e.g., *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81.

{¶ 28} Zimmerman further argues that she had the right to be present at her competency hearing, which she claims the trial court held after she was taken into custody and removed from the courtroom. But the trial court did not hold a competency hearing. In fact, the trial court expressly stated that it was not making a finding as to her competency. The trial court was merely taking into consideration defense counsel's request that she be sent for a competency evaluation. As mentioned before, the trial court did not abuse its discretion in denying counsel's request.

{¶ 29} The first and second assignments of error are overruled.

**Indictment**

{¶ 30} In the third assignment of error, Zimmerman argues that the indictment for failure to stop after accident charge was defective.

{¶ 31} Zimmerman has waived this argument by failing to raise it before trial. See Crim.R. 12(C)(2); *State v. Blalock*, Cuyahoga App. Nos. 80419 and 80420,

2002-Ohio-4580, ¶75.   Therefore, we review her claims solely for plain error.   *State v. Wagers*, Preble App. No. CA2009-06-018, 2010-Ohio-2311.   Notice of plain error must be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.   *State v. Long* (1978), 53 Ohio St.2d 91, 95, 372 N.E.2d 804.   An error does not rise to the level of plain error unless, but for the error, the outcome of the trial would have been different.   Id. at 96-97.

{¶ 32} Zimmerman contends that Count 7 of the indictment, failure to stop after accident, was invalid because it did not recite the entire statute, R.C. 4549.02(A).

R.C. 4549.02(A) provides, in pertinent part, as follows:

"(A) In case of accident to or collision with persons or property upon any of the public roads or highways, due to the driving or operation thereon of any motor vehicle, the person driving or operating the motor vehicle, having knowledge of the accident or collision, immediately shall stop the driver's or operator's motor vehicle at the scene of the accident or collision and shall remain at the scene of the accident or collision until the driver or operator has given the driver's or operator's name and address and, if the driver or operator is not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to any person injured in the accident or collision or to the operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision, or to any police officer at the scene of the accident or collision.

"In the event the injured person is unable to comprehend and record the information required to be given by this section, the other driver involved in the accident or collision forthwith shall notify the nearest police authority concerning the location of the accident or collision, and the driver's name, address, and the registered number of the motor vehicle the driver was operating, and then remain at the scene of the accident or collision until a police officer arrives, unless removed from the scene by an emergency vehicle operated by a political subdivision or an ambulance.

"* * *."

**{¶ 33}** Zimmerman argues that paragraph two of R.C. 4549.02 was "necessary for the indictment to inform her of the charges." We disagree. The second paragraph of R.C. 4549.02(A) informs what a person is to do in the event the injured person is unable to comprehend the information; the subsection requires the other driver, in this case Zimmerman, to stay on scene and wait for the police. The second paragraph was not necessary for Zimmerman to comprehend the charge against her. Thus, we do not find plain error. Accordingly, the third assignment of error is overruled.

## Manifest Weight of the Evidence

**{¶ 34}** In the fourth assignment of error, Zimmerman argues that her convictions were against the manifest weight of the evidence.

**{¶ 35}** In reviewing a claim challenging the manifest weight of the evidence, "[t]he question to be answered is whether there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Internal quotes and citations omitted.) *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶81.

**{¶ 36}** A review of the record in this case does not support a finding that Zimmerman's convictions were against the manifest weight of the evidence. Zimmerman argues that she never saw her boyfriend on the truck and that she did not

attempt to get him off the truck, hurt him, or kill him. She further attempts to discredit Key's testimony, focusing on his criminal record and motive for lying. Zimmerman admitted to smoking marijuana, taking Valium, and drinking alcohol the night of the incident. Puente, the bartender, testified that Zimmerman appeared intoxicated at the bar. Zimmerman admitted she drove the truck with Marzano running alongside. Angel testified that he saw a blond woman driving the truck with a man "hanging from the side of the passenger door" and whose feet were not touching the ground. Angel described the truck as moving fast and making squealing sounds. Finally, Key testified that Zimmerman admitted to him that she had gotten into a fight with her boyfriend and that he was hanging onto the truck for two blocks before he fell off.

{¶ 37} It is within the province of the jury, as the trier of fact in this case, to weigh the credibility of the witnesses. Moreover, we note that Zimmerman was acquitted of multiple charges, including all felony charges.

{¶ 38} Based on these facts, the fourth assignment of error is overruled.

### Coroner's Testimony

{¶ 39} In the fifth assignment of error, Zimmerman challenges the testimony of the coroner. Zimmerman argues that the trial court violated her Sixth Amendment right to confront witnesses against her by allowing Cuyahoga County Corner Frank Miller to testify about Marzano's autopsy even though Dr. Elizabeth Balraj was the pathologist who conducted the autopsy, in violation of *Crawford v. Washington* (2004), 541 U.S. 36,

124 S.Ct. 1354, 158 L.Ed.2d 177.[1]   Before testifying about the autopsy, Dr. Miller stated that he had reviewed all the materials prepared in connection with the autopsy.   After he testified, the defense objected, arguing that the doctor lacked firsthand knowledge of the autopsy.

{¶ 40} In *Crawford*, the United States Supreme Court determined it is error to admit a witness's testimony against a defendant unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id. at 54.

{¶ 41} In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, certiorari denied by *Craig v. Ohio* (2007), 549 U.S. 1255, 127 S.Ct. 1374, 167 L.Ed.2d 164, the Ohio Supreme Court found that a coroner, who was not the coroner that performed the autopsy, was allowed to give expert testimony about autopsy findings, test results, and her opinion about the cause of death; such testimony did not violate the defendant's confrontation rights.   The *Craig* court reasoned that (1) the jury was fully aware that the testifying coroner had not personally conducted or been present during the autopsy; (2) the defense had the opportunity to question the testifying coroner about the procedures that were performed, the test results, and her expert opinion about the time and cause of death.   Id. at 320.

{¶ 42} After *Craig*, the United States Supreme Court decided   *Melendez-Diaz v. Massachusetts* (2009), 557 ___ U.S. ___, 129 S.Ct. 2527, 174 L.Ed.2d 314 and

---

[1]Dr. Balraj retired before Zimmerman's trial.

*Bullcoming v. New Mexico* (2011), ___ U.S. ___, 131 S.Ct. 2705, 180 L.Ed.2d 610. In *Melendez-Diaz*, the Court ruled that the presentation of a lab report without the testimony of the technician who conducted the analysis violated a defendant's Sixth Amendment right to confrontation because the report was testimonial under *Crawford*.

{¶ 43} In *State v. Monroe*, Cuyahoga App. No. 94768, 2011-Ohio-3045, ¶56, this court considered whether *Melendez-Diaz* conflicted with the Ohio Supreme Court's decision in *Craig* and found that it did not. Unlike the lab certificate at issue in *Melendez-Diaz,* which was prepared solely for use at trial, autopsy reports are non-testimonial. Likewise, in this case, Dr. Miller testified that the autopsy report was produced as part of the ordinary course of business in the coroner's office. Thus, the autopsy records were admissible as nontestimonial business records pursuant to Evid.R. 813. See *Craig* at 320, 321. And admission of said records does not conflict with *Melendez-Diaz*. *Monroe* at id.; see, also, *State v. Hardin*, Pike App. No. 10CA803, 2010-Ohio-6304 (holding that *Craig* is still good law under *Melendez-Diaz* and the admission of an autopsy report does not violate the right to confrontation because the report is a non-testimonial business record). Even if the autopsy report was deemed a testimonial statement, the report at issue in this case was signed by Dr. Miller.

{¶ 44} The same day this court released *Monroe*, the United State Supreme Court issued its decision in *Bullcoming*. *Bullcoming* concerned "surrogate" testimony about the test of the defendant's blood alcohol level. The lab analyst who testified was familiar with the laboratory's testing procedures, but had neither participated in nor

observed the test. The Court held that the confrontation clause did not permit "the prosecution to introduce a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Id. at 2710.[2]

{¶ 45} We find this case distinguishable from *Bullcoming*. Here, Dr. Miller testified that he "reviewed the autopsy in progress in the autopsy room." He stated that he discussed the autopsy of Marzano with Dr. Balraj on at least one occasion and reviewed all photographs and reports in preparation for trial. Moreover, at the time of the autopsy, Dr. Miller was the county coroner. As such, he executed the coroner's verdict and signed the autopsy report. He testified that he is involved in cases that go through the coroner's office. Specifically, he testified "each of the deputy coroners is working on my behalf and the manner of death is opined by me, and the cause of death is checked by me in conference with the forensic pathologist or deputy coroner who performed the case." Thus, this is not a case where the testifying coroner took no part in the actual autopsy or findings.

{¶ 46} During trial, Dr. Miller expressed his *own* expert opinion based on an

_____

[2] In her concurrence, Justice Sotomayor wrote that the court's decision did not address "a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue" because the testifying analyst conceded on cross-examination that he played no role in producing the report nor observed any portion of the testing. Id. at 2722. Justice Sotomayor also noted that the Court was not asked to decide "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." Id.

independent analysis of the data presented to him. Although Dr. Miller relied on the analysis conducted by Dr. Balraj, he was "not merely act[ing] as a conduit for the opinion" of Dr. Balraj. See *Commonwealth v. McGrail* (2011), 80 Mass. App. Ct. 339, 952 N.E.2d 969; see, also, *State v. McMillan* (2011), ___ S.E.2d ___, N.C. App. No. COA10-1419. Additionally, defense counsel engaged in a detailed cross-examination of Dr. Miller; therefore, Zimmerman had a full opportunity to confront and cross-examine Dr. Miller concerning his own observations and opinions. See, generally, id. Thus, the doctor's expert opinion was admissible evidence and the trial court did not err in admitting his testimony.[3]

{¶ 47} In light of the above, the fifth assignment of error is overruled.

Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

---

[3] We note that the Ohio Supreme Court has accepted for review the capital case *State v. Craig*, Summit County Common Pleas Case No. CR2006010340, and ordered the parties to brief the following issues: "1. Whether the introduction of the autopsy report completed on Roseanna Davenport violated Donald Craig's Sixth Amendment right to confrontation under *Melendez-Diaz v. Massachusetts* (2009), ___ U.S. ___, 129 S.Ct. 2527, 174 L.E.2d 314"; 2. "Whether Dr. Kohler, a medical examiner who did not conduct the autopsy of Roseanna Davenport, properly testified as to Davenport's cause of death in view of *Melendez-Diaz v.*

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.

_____
LARRY A. JONES,   JUDGE

MARY EILEEN KILBANE, A.J., and
PATRICIA A. BLACKMON, J., CONCUR

---

*Massachusetts*.”   *State v. Craig*, 126 Ohio St.3d 1573, 2010-Ohio-4539, 934 N.E.2d 347.