[Cite as *State v. Crane*, 2014-Ohio-3657.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO. CA2013-02-001 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 8/25/2014 |
| - vs - | | |
| | : | |
| ROBERT W. CRANE, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case No. 2011-2112


Jessica A. Little, Brown County Prosecuting Attorney, Mary McMullen, 510 East State Street, Suite 2, Georgetown, Ohio 45121, for plaintiff-appellee

Julie D. Steddom, 120 Main Street, Ripley, Ohio 45167, for defendant-appellant


**M. POWELL, J.**

{¶ 1} Defendant-appellant, Robert W. Crane, appeals his conviction in the Brown County Common Pleas Court for possession of heroin, possessing drug abuse instruments, and corrupting another with drugs, for which he was sentenced to eight years in prison. For the reasons that follow, we affirm appellant's conviction and sentence.

{¶ 2} On March 17, 2011, appellant found his wife Christine Crane unresponsive at their home in Aberdeen, Ohio and called the life squad, which transported Christine to a

hospital in Maysville, Kentucky. Shortly thereafter, a deputy on the scene observed that appellant was disoriented, sweating profusely, and slurring his speech, and therefore had appellant transported to the same hospital. Christine was pronounced dead at the hospital shortly after her arrival. Appellant was treated for a heroin overdose.

{¶ 3} A search warrant was obtained for appellant's home. When the police executed the search warrant, they discovered drug paraphernalia, including a syringe and needle, a plate, a spoon, a razor blade, a lighter and a plastic card. The plate and spoon were submitted to the Ohio Bureau of Criminal Identification and Investigation for analysis, and those items tested positive for heroin. The syringe and needle were submitted to an independent laboratory for DNA analysis. The DNA analysis revealed that appellant could not be excluded as a major contributor to the DNA found on the syringe while Christine could not be excluded as a minor contributor to the DNA found on the syringe. However, only appellant's DNA was found on the needle.

{¶ 4} On May 26, 2011, appellant was charged in an 11-count indictment with permitting drug abuse in violation of R.C. 2925.13(B), a first-degree misdemeanor (Count One); involuntary manslaughter in violation of R.C. 2903.04(B), a third-degree felony (Count Two); corrupting another with drugs in violation of R.C. 2925.02(A)(2), a second-degree felony (Count Three); involuntary manslaughter in violation of R.C. 2903.04(A), a first-degree felony (Count Four); possession of heroin in violation of R.C. 2925.11(A), a fifth-degree felony (Count Five); possessing drug abuse instruments in violation of R.C. 2925.12(A), a second-degree misdemeanor (Count Six); corrupting another with drugs in violation of R.C. 2925.02(A)(3), a second-degree felony (Count Seven); possession of heroin in violation of R.C. 2925.11(A), a fifth-degree felony (Count Eight); permitting drug abuse in violation of R.C. 2925.13(B), a first-degree misdemeanor (Count Nine); complicity to trafficking in heroin in violation of R.C. 2925.03(A)(1), a fifth-degree felony (Count Ten); and engaging in a

pattern of corrupt activity in violation of R.C. 29223.32(A)(1), a first-degree felony (Count Eleven).

{¶ 5} Appellant's first trial began on April 27, 2012, but was continued in progress to allow the state to depose witnesses who conducted the DNA analysis of the syringe. The trial resumed on October 1, 2012, but the trial eventually ended in a mistrial on October 9, 2012 due to the misconduct of a witness in testifying about a domestic violence incident between appellant and Christine.

{¶ 6} Appellant's second trial began on January 28, 2013. After the state's opening statement, appellant moved for a judgment of acquittal on all charges on the basis that the opening statement did not set forth a prima facie case on any of the charges. The state moved to reopen its opening statement. After argument on the issue, the trial court granted the state's motion to reopen. After the state's supplemental opening statement, the trial court granted appellant's motion for acquittal on Counts One and Nine (permitting drug abuse) and Count Two (third-degree involuntary manslaughter).

{¶ 7} During the testimony of state's witness Deputy Carl Smith, Smith and Deputy Buddy Moore's recorded interview of appellant was played for the jury. In that interview an alleged altercation between appellant and Christine was mentioned. Appellant moved for a mistrial on the basis that the trial court had previously granted his motion in limine regarding evidence of domestic violence between him and Christine, and the state violated the trial court's ruling by failing to redact the incident of domestic violence. The trial court denied appellant's motion for a mistrial and gave no curative instruction to the jury concerning the testimony.

{¶ 8} The state presented the testimony of Dr. Gregory Wanger, M.D., a Kentucky state medical examiner who conducted Christine's autopsy. Dr. Wanger testified that Christine died from heroin toxicity. Dr. Wanger testified that he obtained blood, urine and

vitreous fluid specimens from Christine and sent them to an independent firm known as AIT Laboratories (AIT) for toxicology testing to determine the types and levels of drugs present in Christine's system at the time of her death. Dr. Wanger testified that his office does not have its own toxicology lab, and therefore contracts with AIT to do toxicology testing. He testified that he relied on AIT's toxicology report in formulating his opinion that Christine died from a heroin overdose. A redacted version of Christine's autopsy report, in which several sentences in the report were blacked out but the sentence stating that Christine's cause of death was heroin toxicity was left in the report, was admitted into evidence, and appellant raised no objection to the admission of the redacted autopsy report.

{¶ 9} The state also presented the testimony of 13 witnesses from AIT who were involved in various phases of the toxicological testing of Christine's blood and urine. AIT's toxicology report on Christine was referred to at trial as a "litigation packet," though it is referred to in AIT's paperwork as a "Data Package." The toxicology report was prologued with a "Certification of Authenticity" somewhat akin to a business records certification. The Certification of Authenticity, which was signed by AIT Toxicologist Faith Musko, states:

> This is to certify that the documents in this Data Package are true and accurate reproductions of the original records generated in the normal course of business for this case by employees of AIT Laboratories and maintained in the files of this company.
>
> The documents contained in this Data Package were prepared by the undersigned.
>
> I swear and affirm under penalties for perjury that the foregoing representations are true to the best of my knowledge and belief.

Musko did not testify at appellant's trial. Instead, Kevin Shanks, an expert forensic toxicologist for AIT, testified as a witness for the state regarding AIT's toxicology report.

{¶ 10} Appellant objected to Dr. Wanger's testimony on the basis that the AIT toxicology report was testimonial in nature, the various witnesses from AIT did not address all

phases of the testing of Christine's bodily fluids, and therefore Dr. Wanger's reliance on AIT's toxicology report in forming an opinion as to Christine's cause of death violated his right to confrontation. The trial court overruled appellant's objection and admitted AIT's toxicology report into evidence.

{¶ 11} After the state rested, appellant moved for a judgment of acquittal on the remaining counts. The trial court granted appellant's motion for acquittal as to Count Three (corrupting another with drugs) and Count Four (first-degree involuntary manslaughter). Appellant presented one witness in his defense. The case was submitted to the jury. The jury found appellant not guilty of Count Ten (engaging in pattern of corrupt activity) but guilty of all remaining counts, i.e., Counts Five and Eight (possession of heroin) Count Six (possessing drug abuse instruments) and Count Seven (corrupting another with drugs).[1] The trial court sentenced appellant to eight years in prison.

{¶ 12} Appellant now appeals, assigning the following as error:

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT, IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS, WHEN IT DENIED HIS MOTION FOR ACQUITTAL AND ALLOWED THE PROSECUTOR TO SUPPLEMENT HER OPENING STATEMENT.

{¶ 15} Assignment of Error No. 2:

{¶ 16} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT, IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS, WHEN IT ALLOWED THE ADMISSION OF TESTIMONY THAT HAD BEEN THE SUBJECT OF A MOTION IN LIMINE AND FAILED TO INSTRUCT THE JURY TO DISREGARD SUCH

---

1. Count Eleven was nolled at the beginning of appellant's second trial.

TESTIMONY.

{¶ 17} Assignment of Error No. 3:

{¶ 18} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT, IN VIOLATION OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS, WHEN IT ADMITTED TOXICOLOGY REPORTS WITHOUT THE PRESENCE OF THE ANALYST.

{¶ 19} In his first assignment of error, appellant argues the trial court erred by overruling his motion for acquittal of all the charges against him and by allowing the state to supplement its opening statement after its initial opening statement failed to state the charges against him and did not contain facts that would constitute prima facie evidence of guilt.

{¶ 20} R.C. 2945.10 provides in pertinent part that "[c]ounsel for the state *must* first state the case for the prosecution, and *may* briefly state the evidence by which he expects to sustain it."  (Emphasis added.)

{¶ 21} In *State v. Holmes*, 12th Dist. Butler No. CA90-06-113, 1991 WL 214359, *2-*3 (Oct. 21, 1991), the prosecutor failed to disclose in the state's opening statement the existence of a count in the indictment charging Holmes with having weapons under disability. Recognizing this, Holmes moved for an acquittal on that count at the close of the state's opening statement.  The trial court overruled the motion for acquittal and permitted the state to supplement its opening statement with a statement of the evidence pertaining to that count.  On appeal, Holmes argued the trial court's failure to dismiss the count after the state already had been given the opportunity to explain its evidence to the jury improperly "gave the state 'two bites of the apple.'" *Id.*

{¶ 22} In support of his argument, Holmes cited *State v. Scott*, 8 Ohio App.3d 1, 3 (12th Dist.1983) in which this court held that "[i]f the prosecutor should make an admission of fact which shows that no crime had been committed, or that the accused was not guilty of the

- 6 -

crime charged, doubtless the court would be justified in sustaining a motion to discharge the accused." This holding derived from *State v. Karcher*, 155 Ohio St. 253, 255-256 (1951), where the court noted that it had held in *State v. Lowenstein*, 109 Ohio St. 393 (1924), that "an opening statement by the prosecutor containing facts which would at least constitute prima facie evidence of guilt does not justify the court in taking the case from the jury upon a motion of the accused." *Id.* at 256. Holmes used this language from *Karcher* "to argue, conversely, that an opening statement which does not contain or acknowledge a count alleged in the indictment is ample ground to remove that count from the jury's consideration." *Holmes* at *2. This court rejected that argument, stating as follows:

> In addition to Ohio, a number of other jurisdictions subscribe to the view that a trial court is permitted to grant a judgment of acquittal on the basis of the prosecutor's opening statement. [Citations omitted.]
>
> Courts utilizing this mechanism are almost unanimous in acknowledging that a judgment of acquittal at such an early stage of the trial should be used sparingly and only after careful judicial consideration. Two primary justifications exist for this policy. First, despite appellant's assertion, an opening statement is not evidence, but merely serves the informative function of advising "the jury of the question and facts invoked in the matter before it." [*People v.*] *Gomez* [(1955), 131 Colo. 576, 283 P.2d 949] * * * at 950. Second, and more importantly,
>
> "[i]n criminal cases, the province and powers of the jury as the conscience of the community should rarely, if ever, be usurped by the trial court." *Matter of Ferguson* [(1977), 78 Mich.App. 576, 261 N.W.2d 8] * * * at 10.
>
> To ensure that a prosecutor's accidental or inadvertent omission during an opening statement does not result in the dismissal of a count or case, several courts have added an important prerequisite to the rule. In these jurisdictions, it has been held that a motion to dismiss may be granted on the basis of the state's opening statement provided the state has been given an opportunity to correct, embellish, or explain the defects or errors in the statement.
>
> * * *

In light of the facts present in this case, we find this additional procedural requirement particularly appropriate. At the bench conference which ensued following appellant's motion, the state explained that it was under the impression that the parties had entered a stipulation regarding the count. Upon being informed to the contrary by the trial court, the state promptly offered to advise the jury of the count. The court acceded to the request and permitted the state to supplement its opening statement.

The prosecutor's reasoning suggests that the state's mistaken belief as to the existence of a stipulation was not the product of bad faith. Indeed, the state's desire to amend the opening statement indicates that but for the honest, but nonetheless erroneous, belief as to the existence of a stipulation, evidence of the count would have been presented during the "initial" opening statement. Once permitted to complement its opening statement, the state correctly and adequately advised the jury of the count.

Based on the aforementioned, we find the trial court did not abuse its discretion in overruling appellant's motion to dismiss and subsequently permitting the state to supplement its opening statement.

*Holmes*, 1991 WL 214359 at *3.

{¶ 23} Here, appellant is essentially raising the same argument that was raised in *Holmes* and rejected by this court, to wit: that the trial court erred by overruling his motion for acquittal as to the charges that the state failed to mention in its opening statement and that allowing the state to reopen its opening statement to remedy its oversight prohibits enforcement of the mandatory language in R.C. 2945.10. However, the trial court did not abuse its discretion by permitting the state to reopen its opening statement in this case. While there was not a misunderstanding by the state as to the existence of a stipulation regarding one of the charges as there was in *Holmes*, the state did point out that it had somewhat relied on the trial court's reading of the 11-count indictment to all of the prospective jurors at the commencement of the case.

{¶ 24} In any event, *Holmes* does not indicate that a mistaken belief by the prosecutor is a necessary prerequisite to permitting a re-opening of his or her opening statement. The

law is simply that "a motion to dismiss may be granted on the basis of the state's opening statement provided the state has been given an opportunity to correct, embellish, or explain the defects or errors in the statement." *Id.* at *3. This rule is designed "[t]o ensure that a prosecutor's accidental or inadvertent omission during an opening statement does not result in the dismissal of a count or case[.]" *Id.* At worst, the state's failure in this instance to state its case more completely in its opening statement by stating the charges against appellant or facts that would constitute prima facie evidence of his guilt was "accidental or inadvertent," *id.*, and therefore, the trial court did not abuse its discretion by allowing the state to reopen its opening statement.

{¶ 25} Consequently, appellant's first assignment of error is overruled.

{¶ 26} In his second assignment of error, appellant asserts that the trial court abused its discretion by denying his objection and motion for a mistrial when the prosecutor played a statement made by him to a detective that included a reference to an altercation between appellant and his deceased wife after the trial court's entry on a motion in limine had specifically excluded evidence of domestic violence between the two. Appellant contends, in the alternative, that the trial court erred by failing to offer a curative instruction to the jury.

{¶ 27} Appellant filed a pretrial motion in limine to prohibit the state from presenting testimony from police officers about prior incidents of domestic violence between him and Christine, any statements taken by the officers regarding those incidents, and any observation made by the officers of Christine. The trial court granted appellant's motion, stating in pertinent part:

> The Court hereby grants defendant's Motion in Limine. The State may not produce evidence or prior domestic violence errant or playback altercations between defendant and the decedent by law enforcement officers;
>
> The state may address testimony of statements of the decedent that from November 2010 to March 2011 she made to others that

she was in fear for her safety, as well as that of her father, but may not explain why, pursuant to *State v. Sutorious*, (1997) 122 Ohio App.3d 1;

The State may address testimony from witnesses that the decedent appeared tired or was borrowing money or had physical signs of injury but may not testify as to what decedent told them were the reasons. The witnesses must have personal knowledge about that which they testify to on these issues.

[sic]

**{¶ 28}** At trial, the state presented the testimony of a police officer and played the recorded interview with appellant in which he was refuting claims by Christine's relatives that he physically abused her. During that interview, appellant states that "I've never hit her [Christina]. I've only pushed her back." Appellant objected to this testimony, claiming that its admission violated the trial court's ruling on his motion in limine. The jury was dismissed and the trial court and the parties discussed appellant's motion for a mistrial. The trial court denied the motion for a mistrial after determining that the statement was not "clear evidence of domestic violence, because * * * I think it was a recantation and explanation about-—or to refute, what other family members * * * statements about the defendant were."

**{¶ 29}** Even if the introduction of this statement from appellant's recorded interview violated the trial court's order regarding appellant's motion in limine, the trial court's introduction of that one statement did not prejudice appellant as appellant denied in that statement that he had ever hit Christina and admitted only that he had pushed her back, and therefore the introduction of the statement was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967). Further, it is clear that this one statement did not prejudice appellant in light of the fact that there was admitted into evidence, without objection, graphic testimony from a number of witnesses regarding the bruising and injury they observed on Christina.

**{¶ 30}** As for the trial court's denial of appellant's motion for mistrial, this court stated in

*State v. Motz*, 12th Dist. Warren No. CA2009-10-137, 2010-Ohio-2170, ¶ 12:

> "A trial court should not grant a motion for a mistrial unless it appears that some error or irregularity has been injected into the proceeding that adversely affects the substantial rights of the accused, and as a result, a fair trial is no longer possible." *State v. Thornton*, Clermont App. No. CA2008-10-092, 2009-Ohio-3685, ¶ 11, citing *State v. Reynolds* (1988), 49 Ohio App.3d 27, 33, 550 N.E.2d 490; *State v. Blankenship* (1995), 102 Ohio App.3d 534, 549, 657 N.E.2d 559. The trial court's decision to grant or deny a mistrial rests within its sound discretion, and this court will not disturb such a determination absent an abuse of discretion. *State v. Stevens*, Butler App. No. CA2009-01-031, 2009-Ohio-6045, ¶ 11, citing *State v. Ahmed*, 103 Ohio St.3d 27, 813 N.E.2d 637, 2004-Ohio-4190, ¶ 92; *Thornton* at ¶ 11. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Hancock,* 108 Ohio St.3d 57, 840 N.E.2d 1032, 2006-Ohio-160, ¶ 130.

{¶ 31} Here, the trial court's decision not to declare a mistrial cannot be deemed to have been an abuse of discretion as the alleged error regarding the introduction of the recorded interview occurred on the fourth day of trial after a mistrial had been declared in the first trial. Additionally, for the reasons set forth above, the trial court did not abuse its discretion in allowing this evidence to be admitted, and any error the trial court may have committed in allowing this evidence was harmless beyond a reasonable doubt.

{¶ 32} Appellant cites *State v. Doren*, 6th Dist. Wood No. WD-06-064, 2009-Ohio-167, in support of his argument that a mistrial should have been declared. In *Doren*, a motion in limine excluding from testimony any mention that Doren had taken a polygraph was granted. *Id.* at ¶ 99. Nevertheless, a recording was played for the jury in which there was mention of a polygraph. *Id.* In reversing Doren's conviction due to the admission of the evidence that there was a polygraph, the court of appeals determined that "[w]hile a jury is presumed to follow instructions * * * this jury demonstrated sustained curiosity about a polygraph test by submitting seven written questions despite the first curative instructions," *id.* at 134, and that it was "unlikely that the second curative instruction removed the error's taint from the juror's

- 11 -

minds." The court also found that the other evidence against Doren was "thin and rife with inconsistencies." *Id.* at ¶ 136. However, that is not the case here as the state presented ample evidence to support the charges of which appellant was convicted. Additionally, the trial court cannot be faulted for failing to give a curative instruction since appellant never requested one.

{¶ 33} In light of the foregoing, appellant's second assignment of error is overruled.

{¶ 34} In his third assignment of error, appellant argues the trial court erred by admitting into evidence the AIT toxicology report that was offered by the state as evidence of drug use by Christine because he did not have the opportunity either at or before trial to cross-examine the persons who conducted the testing, and therefore the trial court's admission of the toxicology report denied him his right to confront the persons who conducted the testing. Appellant asserts that because the state failed to present *either* a witness who could testify that he or she performed or had been present for all of the testing, *or* all of the witnesses involved in the entire series of toxicological testing, the trial court's admission of the AIT toxicology report violated his confrontation rights under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527 (2009).

{¶ 35} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." The United States Supreme Court has interpreted this language to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is "testimonial" unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004). The "core class" of statements implicated by the Confrontation Clause includes those "'made under circumstances which would lead an objective witness reasonably to

believe that the statement would be available for use at a later trial.'" *Id.* at 52, quoting the amicus brief of the National Association of Criminal Defense Lawyers.

{¶ 36} *Crawford* did not define the term "testimonial statement" with much specificity, but the United States Supreme Court has subsequently defined the term as meaning those statements made for the "primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, ___ U.S. ___, 131 S.Ct. 1143, 1155 (2011). The court has also stated that "[t]o rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S.Ct. 2705, 2714 (2011), fn. 6, quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266 (2006).

{¶ 37} In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, ¶ 88, the Ohio Supreme Court held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6). The court also held that there was no Sixth Amendment violation in admitting the autopsy report because *Crawford* had indicated that "business records are, 'by their nature,' not testimonial" and thus were admissible, *id.* at ¶ 81, and that "[a]n autopsy report prepared by a medical examiner and documenting objective findings, is the 'quintessential business record.'" *Id.* at ¶ 82, quoting *Rollins v. State*, 161 Md.App. 34, 81 (2005).

{¶ 38} After *Craig* was decided, the United States Supreme Court decided *Melendez-Diaz*, 557 U.S. 305, in which the court held that three notarized certificates of analysis showing that a forensic analysis identified a substance as cocaine were inadmissible and that the analysts who performed the laboratory tests and provided the certificates were required to testify because they were witnesses for purposes of the Confrontation Clause and the defendant had a right to confront them. *Id.* at 311. The court reasoned that the notarized certificates were "quite plainly affidavits" and thus constituted testimonial statements because

they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Id.* at 310-311, quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266 (2006). The court further reasoned that the certificates constituted testimonial statements because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial." *Melendez-Diaz* at 311, quoting *Crawford*, 541 U.S. at 52, quoting the amicus brief of the National Association of Criminal Defense Lawyers.

{¶ 39} In *Bullcoming*, 131 S.Ct. 2705, 2712, the prosecution introduced the forensic report for blood-alcohol concentration in a DWI case, not through the analyst who signed and certified the report, but through an analyst who had not performed or observed the analysis but was familiar with the testing procedures of the laboratory. Although the analyst who testified was a "knowledgeable representative of the laboratory" and was capable of explaining "the lab's process and the details of the report," *id.* at 2733 (Kennedy, J. dissenting), the majority in *Bullcoming* held that the surrogate witness was not a proper substitute for the analyst who conducted the test, because "[t]he accused's right is to be confronted with the analyst who made the certification[.]" *Id.* at 2723. The majority in *Bullcoming* also found that the blood-alcohol analysis reports were testimonial because the certifying analyst in the case, like the analysts in *Melendez-Diaz*, "tested the evidence and prepared a certificate concerning the results of his analysis." *Id.* at 2717.

{¶ 40} In *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221 (2012), an expert witness testified that a DNA profile produced by an outside laboratory known as Cellmark from a rape victim's vaginal swab matched the defendant's DNA profile produced by a state police laboratory from the defendant's blood sample. The Cellmark report itself was neither admitted into evidence nor shown to the fact-finder. Five justices on the *Williams* court held that the expert testimony did not violate a defendant's right to confrontation. Four of the five

justices reasoned that the statements in the Cellmark report were nontestimonial because the out-of-court statements were related by the expert solely for the purpose of explaining the basis of the expert's opinion or the assumptions on which the expert's opinion relied, and were not offered for the truth of those out-of-court statements. *Id.* at 2240-2241. These four justices held, in the alternative, that even if the Cellmark report had been admitted into evidence, it still would not have constituted a testimonial document because it was not prepared for "the primary purpose of accusing a targeted individual[,]" which distinguished it from the forensic reports in *Melendez-Diaz* and *Bullcoming*. *Id.* at 2242. It should be mentioned, however, that the four-justice plurality in *Williams* noted that the case involved a bench trial and that their decision may have been different if the case had involved a jury trial, instead. *Id.* at 2234-2235.

{¶ 41} The fifth justice in the majority in *Williams*, Justice Thomas, joined the plurality in judgment "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered '"testimonial"' for purposes of the Confrontation Clause." *Id.* at 2255 (THOMAS, J., concurring in judgment), quoting *Bryant* at 1167, (THOMAS, J., concurring in judgment). We reject the "formality and solemnity" test as the lynchpin for resolving whether a statement is "testimonial" under the Confrontation Clause. We believe Justice Kagan correctly reasoned that such an approach is unworkable in this context.

> Justice THOMAS's approach, if accepted, would turn the Confrontation Clause into a constitutional geegaw—nice for show, but of little value. The prosecution could avoid its demands by using the right kind of forms with the right kind of language. (It would not take long to devise the magic words and rules—principally, never call anything a "certificate.") And still worse: The new conventions, precisely by making out-of-court statements less "solem[n]," *ante*, at 2255 – 2256, would also make them less reliable—and so turn the Confrontation Clause upside down. See *Crawford*, 541 U.S., at 52–53, n. 3, 124 S.Ct. 1354 ("We find it implausible that a provision which concededly condemned trial by sworn *ex parte* affidavit thought trial by *unsworn ex parte* affidavit perfectly OK"). It is not surprising that

no other Member of the Court has adopted this position. To do so, as Justice THOMAS rightly says of the plurality's decision, would be to "diminis[h] the Confrontation Clause's protection" in "the very cases in which the accused *should* 'enjoy the right ... to be confronted with the witnesses against him.'" *Ante*, at 2232.

*Williams*, 132 S.Ct. at 2276-77 (Kagan, J., dissenting) (footnote omitted).

{¶ 42} In *United States v. James*, 712 F.3d 79, 97-99 (2d Cir.2013), the Second Circuit Court of Appeals held that a routine autopsy report, including the toxicology report that informed it, was not testimonial, and therefore the Confrontation Clause was not violated by admitting the autopsy report and allowing a medical examiner to testify about it, even though the medical examiner did not conduct the autopsy herself. The court arrived at this conclusion after engaging in an exhaustive review of *Melendez-Diaz*, *Bullcoming* and *Williams*. *Id*. at 89-94. The *James* court "distill[ed]" from *Melendez-Diaz* and *Bullcoming* "the principle that a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." *Id*. at 94. The *James* court also found that *Williams* did not contain "a single, useful holding relevant to the case before [it]." *Id*. at 95.

{¶ 43} The *James* court, applying this principle to the case before it, determined that "the autopsy report was not testimonial because it was not prepared primarily to create a record for use at a criminal trial[,]" and therefore there was no error "in admitting the autopsy report into evidence, or allowing a medical examiner to testify about it, even though she did not conduct the autopsy herself." *Id*. at 99. The court also upheld the district court's decisions to admit into evidence a toxicology report and to allow the medical examiner who ordered the report, but did not create it, to testify to the results of the report, finding that these circumstances did not violate the Confrontation Clause. *Id*. at 101-102. The court found that there was no indication in the record that a criminal investigation was contemplated during

the inquiry into the cause of the victim's death or that the toxicology report was completed primarily to generate evidence for use at a subsequent criminal trial, and therefore the court concluded that the toxicology report was nontestimonial. *Id.* at 101-102. In a footnote to its decision, the court noted that "the police were unquestionably involved in the * * * autopsy process, including, for example, transporting forensic samples for testing." *Id.* at fn. 13. However, the court noted that *Williams* "made clear * * * the involvement of 'adversarial officials' in an investigation is not dispositive as to whether or not a statement is testimonial[,]" and that in the case before it, "it appears that was simply the routine procedure employed by the * * * medical examiner in investigating all unnatural deaths, and does not indicate that a criminal investigation was contemplated." *Id.*

{¶ 44} During the pendency of this appeal, the Ohio Supreme Court issued its decision in *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, syllabus, in which the court held:

> An autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

In so holding, the Ohio Supreme Court determined that the United States Supreme Court's decisions in *Melendez-Diaz*, *Bullcoming* and *Williams* did "not require departure from our holding in *Craig*." *Maxwell* at ¶ 54.

{¶ 45} The *Maxwell* court noted:

> A key element in evaluating the admissibility of the coroner's testimony and the autopsy report in light of the recent United States Supreme Court cases is the primary-purpose test, which examines the reasons for and purpose of the record in question. To determine the primary purpose, a court must "objectively evaluat[e] the statements and actions of the parties to the encounter" giving rise to the statements.

*Id.* at ¶ 49, citing *Bryant*, ___ U.S. ___, 131 S.Ct. at 1162 and *Williams*, ___U.S. ___, 132

S.Ct. at 2243 (plurality opinion of Alito, J.).

{¶ 46} The *Maxwell* court determined that:

> [a]n analysis of the primary-purpose test bears out *Craig's* conclusion that autopsy reports are nontestimonial. Autopsy reports are not intended to serve as an "out-of-court substitute for trial testimony." *Bryant*, —— U.S. ——, 131 S.Ct. at 1155, 179 L.Ed.2d 93. Instead, they are created "for the primary purpose of documenting cause of death for public records and public health." Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement,* 96 Cal.L.Rev. 1093, 1130 (2008); *see also People v. Leach*, 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570, ¶ 129 (a medical examiner is "charged with protecting the public health by determining the cause of a sudden death").

{¶ 47} In applying the primary-purpose test to the case before it, the *Maxwell* court stated as follows:

> Ohio coroners conduct autopsies pursuant to the authority granted to them by R.C. Chapter 313. Coroners must "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under [their] jurisdiction." R.C. 313.09. The death certificate also must indicate the "manner and mode in which the death occurred." R.C. 313.19. If the cause and manner of death are not apparent—as when someone "dies as a result of criminal or other violent means, by casualty, by suicide, or in any suspicious or unusual manner" or "when any person * * * dies suddenly when in apparent good health," R.C. 313.12—the coroner is notified so that an autopsy may be conducted. An autopsy is a "compelling public necessity" if it is needed to "protect[ ] against an immediate and substantial threat to the public health" or to assist law enforcement in conducting a murder investigation. R.C. 313.131.
>
> Although autopsy reports are sometimes relevant in criminal prosecutions, Craig rightly held that they are not created primarily for a prosecutorial purpose. Consistent with *Craig*, other courts have held that coroners are statutorily empowered to investigate unnatural deaths and authorized to perform autopsies in a number of situations, only one of which is when a death is potentially a homicide. *People v. Leach*, 405 Ill.App.3d 297, 308–309, 345 Ill.Dec. 694, 939 N.E.2d 537 (2010), *aff'd,* 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570; *Dungo*, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442 (testimony by a chief medical examiner who did not prepare the decedent's autopsy

report was admissible); *United States v. James,* 712 F.3d 79, 97 (2d Cir.2013) (autopsy report was to be considered on whether it was "prepared with the primary purpose of creating a record for use at a later trial").

Ohio courts of appeals have also continued to uphold the admissibility of autopsy reports prepared by nontestifying medical examiners since *Melendez–Diaz. State v. Hardin*, 193 Ohio App.3d 666, 2010-Ohio-6304, 953 N.E.2d 847, ¶ 9–20 (4th Dist.) (autopsy report prepared by nontestifying medical examiner admissible as a nontestimonial business record, since it was not prepared for purposes of litigation); *State v. Zimmerman*, 8th Dist. Cuyahoga No. 96210, 2011-Ohio-6156, 2011 WL 5997588, ¶ 43–45 (admissibility of autopsy report prepared by nontestifying medical examiner does not conflict with *Bullcoming*); *State v. Adams*, 7th Dist. Mahoning No. 08 MA 246, 2012-Ohio-2719, 2012 WL 2308131, ¶ 20, 26 (*Craig* still controls and autopsy report is nontestimonial evidence under *Crawford*, as it is not made solely at the behest of police in order to convict the particular defendant); *State v. Monroe*, 8th Dist. Cuyahoga No. 94768, 2011-Ohio-3045, 2011 WL 2476280 (*Craig* not in conflict with *Melendez–Diaz*).

* * * The dissent rejects the primary-purpose test and would hold that whether a particular autopsy report is testimonial should be determined on a case-by-case basis. But generally, autopsy reports are neither (1) prepared for the primary purpose of accusing a targeted individual nor (2) prepared for the primary purpose of providing evidence in a criminal trial. For Sixth Amendment purposes, it is only the primary purpose of a document that determines whether it is testimonial or not.

*Melendez–Diaz* and *Bullcoming*, on which Maxwell relies, are readily distinguishable here. In both cases, the forensic reports were made at the request of police, for specific "evidentiary purposes" in order to aid in a police investigation. The record does not show that to be the case here. We hold that an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

*Maxwell*, 2014-Ohio-1019 at ¶ 58-63.

{¶ 48} Here, appellant does not argue on appeal that the trial court violated his

confrontation rights by admitting into evidence Christine's autopsy report. Instead, he argues

the trial court violated his confrontation rights by admitting into evidence the AIT toxicology report that was ordered by Dr. Wanger and used by him to determine the cause of Christine's death.

{¶ 49} In *James*, 712 F.3d 79, 101-102, the court, in holding that a toxicology report was not testimonial and therefore did not implicate the Confrontation Clause, found that there was no indication in the record that a criminal investigation was contemplated during the inquiry into the cause of the victim's death and nothing to indicate that the toxicology report was completed primarily to generate evidence for use at a subsequent criminal trial. Here, the only indication in the record that a criminal investigation was contemplated during the inquiry into Christine's death is the language in the Coroner's Investigation Report, in which Coroner Robert Brothers wrote "Please ck [check] for injection sites—dec. [Christine] works where employees are screened. There may be a problem here." However, Brothers' statement that "[t]here may be a problem here[,] is not sufficient to render the AIT toxicology report testimonial as it appears to be simply a part of "the routine procedure" employed by coroners in Kentucky. *Id.* at fn. 13.

{¶ 50} KRS 72.025 requires coroners in Kentucky to order a post-mortem examination not only "[w]hen the death of a human being appears to be caused by homicide or violence[,]" KRS 72.025(1), but also in eighteen other circumstances, including "[w]hen the death of a human being appears to be the result of the presence of drugs or poisons in the body[,]" KRS 72.025(3), or "[w]hen the manner of death appears to be other than natural[.]"

{¶ 51} Brothers' statement that "[t]here may be a problem here" was vague and not targeted to anyone, and it does not demonstrate that AIT's toxicology report was either prepared for the primary purpose of accusing a targeted individual or prepared for the primary purpose of providing evidence in a criminal trial. Instead, the toxicology report was prepared for the primary purpose of fulfilling the request made by one of AIT's clients,

namely, Dr. Wanger, who requested the report in order to determine the cause of Christine's death, which Dr. Wanger was statutorily obligated to do.  *See* KRS 72.245 ("[a]t the request of the coroner the county or district medical examiner shall assist in the investigation of deaths).  *See generally* KRS 72.210 (purpose of the Office of the Kentucky State Medical Examiner is "to aid, assist, and complement the coroner in the performance of his duties by providing medical assistance to him in determining causes of death").  Neither the Coroner's Investigation Report, the AIT toxicology report nor the autopsy report implicated any person in Christine's death in any respect and particularly as having supplied or administered the lethal dose of heroin.  Consequently, the AIT toxicology report that was created at the medical examiner's (Dr. Wanger's) request and used by him to determine the cause of Christine's death was nontestimonial for purposes of the Confrontation Clause, and therefore the trial court did not err in admitting it into evidence at trial.  *James*, 712 F.3d 79, 101-102.

**{¶ 52}** Appellant notes that the state occasionally referred to AIT's toxicology report as a "litigation packet," and states that "[b]y definition a 'litigation packet' is not a document created for the administration of AIT Laboratory's affairs, but was created for the sole purpose of use by the State at trial."  However, we decline to interpret the state's occasional reference to AIT's toxicology report as a "litigation packet" as meaning that the primary purpose of that report was for its use at trial.  AIT's primary purpose in creating the toxicology report was to serve the interest of its paying client, Dr. Wanger, and Dr. Wanger's primary purpose in requesting the toxicology report was to determine the cause of Christine's death, which he was statutorily obligated to do.

**{¶ 53}** Additionally, we note that Christine's autopsy report that was prepared by Dr. Wanger and listed heroin toxicity as the cause of Christine's death was admitted into evidence without objection.  Because the autopsy report was "neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of

providing evidence in a criminal trial," the report is "nontestimonial" and thus was admissible as a business record under Evid.R. 803(6), and the admission of the autopsy report into evidence did not violate appellant's Sixth Amendment confrontation rights. *Maxwell*, 2014-Ohio-1019 at syllabus. Consequently, any error in the admission of the AIT toxicology report was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

**{¶ 54}** Accordingly, appellant's third assignment of error is overruled.

**{¶ 55}** Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.